962 So.2d 585 (2006)
Art SCAFIDE, Individually, and as Administrator of the Estate of Marlene E. Goss, Deceased, Appellant
v.
Victor T. BAZZONE, M.D., and John W. Godsey, M.D., Appellees.
No. 2004-CA-01658-COA.
Court of Appeals of Mississippi.
September 12, 2006.
Rehearing Denied April 10, 2007.
*587 John L. Hunter, Pascagoula, C. Victor Welsh, Jackson, attorneys for appellant.
Elizabeth Claire Barker, John A. Banahan, Pascagoula, Stephen Giles Peresich, Biloxi, Melinda Owen Johnson, Pascagoula, attorneys for appellees.
*588 EN BANC.
SOUTHWICK J., for the Court.
¶ 1. The administrator of an estate brought suit against four physicians seeking damages for the allegedly wrongful death of their patient. The plaintiff's allegation was that the deceased had been misdiagnosed as having a malignant brain tumor and received radiation treatment that in fact caused her death. The cure, in the plaintiff's view, was undeniably worse than the disease. During trial in Jackson County Circuit Court against two of the doctors, a directed verdict was granted for one defendant. The jury later returned a verdict in favor of the other physician. On appeal, the heirs argue that the directed verdict was improperly granted and that a new trial should be granted as to both physicians. We find no error and affirm.

FACTS
¶ 2. On March 7, 1996, Marlene Goss was examined at the clinic of Dr. Dianne Ross, a Jackson County, Mississippi neurologist. Ms. Goss had been suffering from recurring pain in her neck and head. To assist in the diagnosis, Dr. Ross had a magnetic resonance imaging (MRI) scan of Goss's brain made on March 13. The MRI revealed that Goss had a large tumor in her head. Dr. Hoshall Barrett, a radiologist, read the MRI and discussed his findings with Dr. Ross. Dr. Barrett stated that the tumor seemed to be a high grade glioma, which is cancerous, but he did not render a firm opinion. After this discussion, Dr. Ross believed that the tumor was most likely cancerous.
¶ 3. On March 14, Dr. Ross telephoned a local neurosurgeon, Dr. Victor Bazzone. Without identifying her patient, Dr. Ross generally explained the medical evidence about Ms. Goss. Dr. Ross stated that there was evidence of a glioblastoma multiforme, which is a cancerous tumor, and asked for Dr. Bazzone's treatment recommendation if that was the condition. Dr. Bazzone responded that his recommendation would be steroids and radiation treatment. Dr. Ross recommended that Ms. Goss see Dr. Bazzone, to which Dr. Bazzone agreed, and also that she be examined by Dr. John Godsey, a radiation oncologist. Ms. Goss and some members of her family were in Dr. Ross's office when this telephone conversation with Dr. Bazzone occurred and were told of what he had said, including the referral recommendations. We note here that Ms. Goss never was seen by Dr. Bazzone.
¶ 4. On March 20, 1996, Goss and two of her children had a lengthy consultation with Dr. Godsey. Dr. Godsey reviewed the MRI films. His medical notes reflected several relevant facts. He was aware that Dr. Ross had consulted with Dr. Bazzone. Goss and her children informed Dr. Godsey that they had the impression that Dr. Bazzone had seen the MRI scan and that he had recommended foregoing any attempt at surgery to obtain a tissue sample for a biopsy, since that would probably produce no more than a tissue confirmation. Dr. Bazzone would not in fact examine the MRI until later. It is true, though, that Dr. Bazzone informed Dr. Ross that on the basis of the report of the MRI scan that she described to him, he would not recommend surgery for a biopsy.
¶ 5. Dr. Godsey's notes also stated that Goss "truly is not interested in pursuing this [issue of diagnosis confirmation] further and wishes to proceed" with the radiation. His final comment on the notes was "I cannot guarantee any outcome nor can I assure of an `absolute' diagnosis. I used the word `absolute' because this is the word the patient used as well and . . . this treatment without histological confirmation *589 is exactly what this patient continues to express as her desire."
¶ 6. The same day as the appointment with Dr. Godsey, Dr. Ross's office called Dr. Bazzone's office to schedule an appointment for Ms. Goss. The appointment set that day for March 25 was later cancelled by Ms. Goss. She had already met with Dr. Godsey and decided to seek no further examination or surgery to confirm the diagnosis and need for radiation treatment. Testimony from some of Ms. Goss's family confirmed that they strongly encouraged her to see Dr. Bazzone. Ms. Goss refused, based on considerations such as cost, the desire to avoid the brain surgery needed to obtain tissue for a biopsy, and perhaps also the belief created by the physicians that it was likely that the result of the surgery would simply confirm what they already believed.
¶ 7. Dr. Bazzone received Dr. Godsey's consultation notes on April 3. In response, Dr. Bazzone wrote a note dated April 3 and sent it to Drs. Godsey and Ross. He summarized what he had done so far, and corrected what Dr. Ross's note indicated she had been told by Ms. Goss. Dr. Bazzone stated in this note that he had not reviewed the MRI. He also indicated that Ms. Goss had cancelled her appointment with him.
¶ 8. On April 4, Dr. Bazzone wrote another note that did not indicate it was to be sent to the other two doctors. He wrote that since the previous day's note he had reviewed the MRI scans that were brought to his office by Ms. Goss before she cancelled her appointment. He wrote that he retained his opinion that the tumor was a glioblastoma multiforme and that radiation treatment and high dose steroids should be the treatment. He further stated that he would not recommend a "surgical procedure." At trial, Dr. Bazzone explained that the surgery he meant was the kind he formerly did on patients with a confirmed diagnosis of this kind of tumor, which was "to open the heads, take out the tumor, and try to remove as much as possible, knowing that I wasn't going to get it all, and then proceeding with additional treatment."
¶ 9. For some reason, the April 4 note was sent to Dr. Godsey and a copy was found in Ms. Goss's hospital medical records. Dr. Bazzone testified that the April 4 note being sent out of his office was not intended since it added nothing to his previous opinion. Dr. Godsey saw the note during the period of the radiation treatment and testified that no reliance was placed on that note. On the other hand, Dr. Godsey testified that had the April 4 note stated that the tumor may have been non-cancerous, then the radiation treatment would have stopped.
¶ 10. Dr. Godsey began Ms. Goss's radiation therapy on March 25, and it concluded on May 21, 1996. Because of continuing problems in July 1996, Goss was evaluated at University of Mississippi Medical Center in Jackson. The evaluating physician, Dr. Ruth Fredricks, was of the opinion that the March 13, 1996 MRI in fact showed only an atypical meningioma (a non-cancerous tumor) and recommended that the tumor be extracted by surgery. A biopsy performed after the surgery confirmed Dr. Fredricks' diagnosis of a nonmalignant tumor. Dr. Bazzone stated in his April 4 note that he did not believe the MRI showed a meningioma. No radiation treatment would have been required for this type of tumor. Goss underwent a surgical extraction of the tumor in December 1996. Thereafter, Goss had numerous falls and her health began to decline rapidly. Goss died on August 23, 1997. The certificate of death lists the cause as recurrent aspiration due to, or as a consequence of dementia, with other significant *590 conditions, and from the meningioma. There is no significant dispute in this case that Ms. Goss's death was the result of the effects of the radiation treatment that she did not in fact need to have received to treat her tumor.
¶ 11. Suit was brought against four of the physicians who had been involved in Goss's treatment. Both Dr. Ross and Dr. Barrett were dismissed on summary judgment prior to trial. No appeal has been taken as to those judgments. The judgments in favor of Dr. Bazzone and Dr. Godsey are the only subjects of today's appellate challenge.

DISCUSSION
ISSUE 1: Physician's Legal Duty of Care
¶ 12. In the order granting the directed verdict, the court found that there was no doctor-patient relationship between Dr. Bazzone and Ms. Goss on March 14, 1996, when the phone conversation between Dr. Bazzone and Dr. Ross occurred. The trial court held that even though a formal relationship "is not always necessary for a physician" to have liability, it still is necessary to "look to the nature of the duty owed by a physician to an individual." In granting a directed verdict, the court held that no duty arose from Dr. Bazzone's telephone conversation about treatment based on orally described medical evidence. The trial court stated that Dr. Bazzone's subsequent interpretation of the MRI could be grounds to find a doctor-patient relationship under certain circumstances. The court found no legal duty on these facts because Dr. Bazzone intended the review of records on April 4 for his own purposes and not to affect the patient's treatment. Thus, the trial court granted judgment to Dr. Bazzone based on an absence of duty under tort law arising from either the phone conversation or the three-week later review of the MRI.
¶ 13. As an alternative basis for the directed verdict, the trial court made this statement: "There is no expert testimony in the record that if a duty of care arose by his affirmative act of writing the April 4, 1996 note, that he breached that duty." The trial court referred to expert testimony that Dr. Bazzone's opinion that radiation treatment should be performed without a confirmatory biopsy was inconsistent with the standard of care. It would appear that the trial court found that the MRI could be interpreted non-negligently to indicate a cancerous tumor, but treatment without first obtaining a biopsy may have breached a standard of care. The plaintiffs challenge the meaning of this part of the judge's decision and argue that the court was stating that expert medical opinions were needed to define the duty. We find the better interpretation of the judge's statement to be that even if a duty existed towards Ms. Goss by Dr. Bazzone, there must be expert testimony that what he did was a breach of that duty. Since this part of the trial court's opinion was an alternative basis for granting a directed verdict, we do not further explore its meaning and validity.
¶ 14. There is no real disagreement with the conclusion that no doctor-patient relationship ever arose between Dr. Bazzone and Ms. Goss. The existence of a formal relationship was still required for physician liability in 1990, when the Mississippi Supreme Court, in an opinion written by Justice Joel Blass, held that the relationship was part of the prima facie case in a medical malpractice claim. Beaman v. Helton, 573 So.2d 776, 778 (Miss.1990). Almost exactly eighteen months later, the Court overruled Beaman "to the extent that it holds that a negligence action may not be instituted in the absence of a doctor-patient *591 relationship." Meena v. Wilburn, 603 So.2d 866, 870 (Miss.1992). In a concurring opinion by Justice Charles R. McRae, joined by a majority of the justices, it was stated that "whenever physicians or other medical personnel undertake the responsibility of providing health care, they subject themselves to potential liability under the medical negligence cause of action." Meena, 603 So.2d at 875 (McRae, J., concurring). That opinion was written initially as a dissent, then altered to a special concurrence when the majority revised its opinion to make explicit the overruling of the relevant Beaman holding. Id. at 875 n. 1.
¶ 15. Because of its facts, Meena was a particularly compelling vehicle to drive away from the requirement of the formal relationship. The doctor ordered a medical procedure (removal of surgical staples) to be performed by a nurse on a specific individual who was sitting in a two-person hospital room. Neither of the people in the room was the doctor's original patient. An absent physician had asked that the doctor make certain the staples on one patient were removed. The doctor went to the patient's room, talked briefly with the person he thought was the right patient, then left instructions with a nurse to remove the staples as he responded hurriedly to an emergency call. Id. at 867-68. Unfortunately, the person whose staples were removed was not the correct patient, as it was the other patient in the room who was ready for that procedure. Significant injury allegedly arose from the premature and mistaken removal of the staples. The act on the plaintiff was a battery regardless of medical negligence rules. Id. at 870 n. 6.
¶ 16. There are significant factual distinctions between negligently directing that certain persons who are not patients have medical procedures performed on them and the actions taken by Dr. Bazzone in this case. Dr. Bazzone gave telephone advice about a treatment course to another doctor who orally described the medical evidence. Later he looked at an MRI and wrote a note  perhaps only for his own records  that he still believed what he had said over the telephone was correct. In Meena, the defendant doctor thought the plaintiff was his patient and gave negligent treatment. In this case, the defendant Dr. Bazzone never considered Ms. Goss his patient, did not undertake treatment of her, and was not given the responsibility by another doctor of examining medical records. However, after Ms. Goss left her MRI then cancelled her appointment with Dr. Bazzone, he looked at the MRI enough to confirm his earlier, less informed, similarly erroneous opinion.
¶ 17. In Meena, the defendant physician negligently acted as the treating physician without an actual doctor-patient relationship existing. To let the absence of the formal relationship control would ignore the harm caused by the positive and negligent act of an individual simply because he was a physician. On the facts with which we are presented, a doctor responded to a request for advice from the treating physician. Dr. Bazzone was willing then to see Ms. Goss, but she did not keep her appointment. Not having been formally consulted nor employed to read the MRI, Dr. Bazzone nonetheless later did look at it. If that examination of the MRI, or for that matter the earlier telephone advice that responded just to oral descriptions of symptoms, breached a standard of care, then the negligence was performed by someone who was a volunteer. Unlike Meena, in this case Dr. Bazzone always knew that Ms. Goss was not his patient. What he did when she neither was in fact nor was considered to be his patient is the basis of this claim.
*592 ¶ 18. Moving beyond the issues of relationship and duty, there is this evidence of negligence. There was not much on which to base a claim of a deviation from the standard of care on interpreting the MRI. If a duty existed, Dr. Fredricks, who ultimately made the proper diagnosis, gave an affidavit that both Dr. Bazzone and Dr. Godsey deviated from the standard of care by recommending radiation without confirming the condition through a biopsy. Dr. Fredricks also gave a video deposition. She indicated that she had understood Dr. Bazzone saw Ms. Goss. Upon learning that Dr. Bazzone had not, Dr. Fredricks said that she would have no way of knowing whether anything Dr. Bazzone stated would have affected Ms. Goss's decision to forego a biopsy.
¶ 19. The only meaningful expert evidence about a breach of the standard of care  again without deciding that there was a duty  was that the avoidance of a biopsy was the problem. We note that there was some ambiguity about just what Dr. Bazzone said and what Dr. Ross should have understood from the phone conversation. Dr. Bazzone testified that he was indicating what should be done if it was clear that this was the kind of cancerous tumor that Dr. Ross believed it to be. There was also evidence from Dr. Ross that she understood Dr. Bazzone to be suggesting, based on what he was told on the telephone, that no surgery to remove some tissue was needed. She also indicated that Dr. Bazzone was discussing treatment options for the "worst case scenario," which would suggest that the premise of the discussion was the existence of this form of dreaded tumor, not options of confirming its existence. Dr. Bazzone testified that the April 4 note, when it referred to "surgical procedure," was rejecting the desirability of surgical removal of the tumor itself. The explanation was reasonable based on the language of the note and was not factually contested. What Dr. Bazzone testified is that based on his experience, surgical removal of these kinds of tumors was usually ineffective. Though in the past he had performed such surgeries, he now believed other treatment options were preferable.
¶ 20. With these facts, we now turn more directly to an examination of the law. Whether a duty is owed in a negligence action is a question of law and on appeal is reviewed de novo. Belmont Homes, Inc. v. Stewart, 792 So.2d 229, 232 (Miss.2001). A motion for a directed verdict should not be granted if reasonable inferences from the evidence present a question of fact for the jury. Windmon v. Marshall, 926 So.2d 867, 872 (Miss.2006).
¶ 21. The concept of duty is grounded in a legal obligation being owed to a specific party. See PROSSER AND KEETON ON TORTS § 53, 356-58 (5th ed.1984). Determining whether a duty is owed is approached by asking "whether the plaintiff's interests are entitled to legal protection against the defendant's conduct," rather than focusing solely on the level of relationship between parties. Id. The Mississippi Supreme Court in Meena took the review of medical malpractice claims away from the requirement of a relationship as the threshold. Still, in general it is stated that a prima facie case for medical malpractice requires that a doctor-patient relationship be established. See Cheeks v. Bio-Medical Applications, Inc., 908 So.2d 117, 120 (Miss.2005). That means that in most cases, the absence of the relationship does prevent the creation of a duty. However, where the traditional tort elements can be proven, a prima facie case for negligence against a physician can be maintained absent a doctor-patient relationship. Meena, 603 So.2d 866. A duty can arise for other reasons. The analysis *593 in Meena applies to all medical malpractice claims, but a finding of liability when there is no doctor-patient relationship remains the exception and not the norm.
¶ 22. There are two relevant occasions when Dr. Bazzone could have incurred a legal duty to Goss. The first was on March 14 during the telephone conversation with Dr. Ross. The second was on April 4 when Goss's MRI was reviewed and a note made describing Dr. Bazzone's conclusions from that review. Generically, the issues raised under this claim of error first deal with the situation of informal, what at times is called "curbside" or "sidewalk" consultations, and second, whether a doctor has a duty to perform a medical task as a volunteer with the same standard of care as if the relationship of doctor-patient exists. Whenever a doctor looks at medical records of someone who he is not treating and with whom he has no relationship, is he liable if he does not apply the same level of expertise and care as he is required to do for actual patients?
¶ 23. Stepping back to look at the issue, we accept that professionals, including doctors, have duties that "include a commitment to professional competence, honesty with patients and scientific knowledge." 1 STEVEN E. PEGALIS, AMERICAN LAW OF MEDICAL MALPRACTICE 3D, 203 (2005). It is also the responsibility of doctors to "pursue continually the acquisition of new knowledge by reading, attending conferences and courses, and consulting colleagues. . . ." Id. at 204 (emphasis added). Among the effects of liability for sidewalk consultations would be to discourage doctors from giving informal advice, which in turn would decrease the occasions in which doctors would uphold this beneficial professional standard of seeking the advice.
¶ 24. There is no consistency in the country regarding the need for a doctor-patient relationship as a prerequisite to maintaining an action against a physician. Some states still require the formal relationship, as did Mississippi until Meena. See Roberts v. Hunter, 310 S.C. 364, 426 S.E.2d 797, 799 (1993); Easter v. Lexington Mem'l Hosp'l, Inc., 303 N.C. 303, 278 S.E.2d 253, 255 (1981). In the forty-nine other state laboratories of judicial decision-making, we will not find authority controlling on this state's analysis. We do seek assistance, though.
¶ 25. An Arizona decision usefully addressed relevant considerations that arise from expanding the duty beyond the doctor-patient relationship. Stanley v. McCarver, 208 Ariz. 219, 92 P.3d 849, 851-52 (2004). A company hired a radiology group to evaluate the x-rays of a prospective employee for tuberculosis as part of a pre-employment screening. Id. at 850. The radiology group contracted with a radiologist to actually read and submit a report on the x-rays. The radiologist found an abnormality that was not associated with tuberculosis but was a sign of lung cancer. The radiologist reported the results to the radiology group and the group reported the results to the prospective employer. The employee was never notified of the x-ray results and was diagnosed with lung cancer ten months later. Id. at 851. The radiologist was granted summary judgment because the trial court found that the doctor did not owe a duty to the employee. Id. The Arizona Supreme Court held that a doctor who undertakes to read x-rays for consideration and finds seriously abnormal results, has a duty to act reasonably in reading the x-rays and reporting the results. Id. at 855.
¶ 26. In Arizona, an undertaking, grounded in the law of contracts, gave rise to a doctor-patient relationship, and therefore a duty resulted. Id. at 851. However, the Arizona Supreme Court decided, as *594 the Mississippi court did in Meena, that the lack of a doctor-patient relationship will not exclude a duty from the doctor to a patient. Id. at 852. The Arizona court expressed the opinion that "the proper inquiry is whether a sufficient relationship exists . . . to make it reasonable, as a matter of public policy, to impose a duty." Id. at 852. The Arizona court referred to Meena as comporting with Arizona's "focus on the sufficiency of the relationship as a basis for imposing a duty." Id. at 853 (citing Meena, 603 So.2d at 870). Stanley emphasized that the duty is not imposed because the doctor was in a position to prevent future harm: "prevention of harm alone will not support the imposition of a duty." Id. at 856 (citing WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 56, 340-43 (4th ed.1971)). The Arizona court concluded that duty flows from "the panoply of social concerns that generally inform tort law." Id. at 856.
¶ 27. A few states have sought to articulate factors of whether a duty should be imposed on a doctor that has some involvement with a patient. Oja v. Kin, 229 Mich.App. 184, 581 N.W.2d 739, 743 (1998) (distinguishing between a doctor offering a professional opinion and directing the course of a patient's treatment); Corbet v. McKinney, 980 S.W.2d 166, 169 (Mo.App. 1998) (distinguishing between advising on general patient care and undertaking to examine, diagnose, or treat a patient). In one treatise, an earlier edition of which was cited in Meena, factors were described that are often considered in determining whether to impose a duty:
(1) Foreseeability of harm to the plaintiff;
(2) The degree of certainty that the plaintiff suffered injury;
(3) The closeness of the connection between the defendant's conduct and the injury suffered;
(4) The moral blame attached to the defendant's conduct;
(5) The policy of preventing future harm;
(6) The extent of the burden to the defendant and community of imposing a duty to exercise care with resulting liability for breach;
(7) The availability, cost and prevalence of insurance for the risk involved.
1 J.D. LEE AND BARRY A. LINDAHL, MODERN TORT LAW § 3:3 3-12 (2nd ed.2002) (1990 edition cited in Meena, 603 So.2d at 870 n. 9).
¶ 28. In addition, these public policy concerns may usefully be applied:
(1) The injury is too remote from the negligence;
(2) The injury is too wholly out of proportion to the tortfeasor's culpability;
(3) In retrospect it appears too highly unlikely that the negligence should have resulted in harm;
(4) Allowing recovery would place too unreasonable a burden on the tortfeasor;
(5) Allowing recovery would be too likely to open the way for fraudulent claims; and
(6) Allowing recovery would enter a field that has no sensible or just stopping point.
LEE & LINDAHL, MODERN TORT LAW, at 3-13.
¶ 29. Using these legal materials, we now turn to whether a duty arose when Dr. Bazzone discussed his reaction over the telephone to the medical information orally discussed with him by Dr. Ross on March 14. Described was an unidentified patient who had an aggressive tumor that showed signs of being cancerous. Dr. Bazzone did not render an opinion concerning whether the tumor was cancerous or diagnose the illness during the conversation with Dr. Ross. Dr. Bazzone accepted *595 the diagnosis given by Dr. Ross and agreed with the treatment approach. He also stated that based on what he was told, he would proceed without surgery that would gain tissue for a biopsy. The conversation between Dr. Ross and Dr. Bazzone could in some ways be compared to the situation of Dr. Ross's consulting a medical treatise or manual on the treatment for a glioblastoma. Without seeing a patient or having any other personal knowledge, Dr. Bazzone gave an opinion that serves the public policy purpose to encourage and not discourage such conversations. The followup to the conversation was to be an examination by Dr. Bazzone. That exam never occurred because Ms. Goss declined. No duty by Dr. Bazzone arose from this informal consultation.
¶ 30. We find no different result because Ms. Goss and her family were aware of the conversation and of Dr. Bazzone's advice. Ms. Goss knew the limits of Dr. Bazzone's involvement and of the recommendation that Dr. Bazzone examine her and her records. For a few days she proceeded with the plan to see Dr. Bazzone, then cancelled. This potential relationship was abandoned and no doctor-patient relationship was therefore formed. Her heirs do not argue otherwise.
¶ 31. The second factual basis for finding a duty is Dr. Bazzone's later examination of Ms. Goss's MRI. Between March 14 and April 4, Goss cancelled her appointment with Dr. Bazzone and refused to consult with any other neurosurgeon. A neurosurgeon is the proper doctor to perform a biopsy to confirm the cancerous nature of the tumor. The physician who directed the radiation therapy, Dr. Godsey, agreed with the MRI interpretation performed by Dr. Barrett that the tumor was aggressive and showed signs of being cancerous. Dr. Godsey recommended to Ms. Goss that confirmation of the cancerous nature of the tumor be obtained by her seeing Dr. Bazzone or another neurosurgeon. It is true that Dr. Bazzone did not believe a biopsy was necessary.
¶ 32. Ms. Goss's radiation treatment began before Dr. Bazzone saw her MRI on April 3-4. By that date, she had received about twenty percent of the treatment. Dr. Bazzone never discussed the tumor with Ms. Goss, her family, or Dr. Godsey. On April 3, in response to Dr. Godsey's consultation note that was sent to Dr. Bazzone, Bazzone informed Godsey through a medical note that he had not seen any medical records of Ms. Goss, thereby correcting a misstatement in Dr. Godsey's notes. The next day, Dr. Bazzone reviewed Ms. Goss's MRI, allegedly and reasonably because he had never actually seen any records in relation to Goss. He states that his April 4 note was only for his own records. His testimony is the only direct evidence of that, and the note did not indicate, as did the April 3 note that clearly was intended for Dr. Godsey and Dr. Ross, that anyone else was to be given a copy of it. Dr. Bazzone noted on April 4 that he retained his previous conclusion that the tumor was consistent with a glioblastoma, would recommend radiation treatment, and would not advise surgery. There was evidence that the April 4 note was sent inadvertently to Drs. Ross and Godsey and was also in the hospital medical records of Goss.
¶ 33. What was uncontested by any contrary evidence was that by April 4, no one was expecting Dr. Bazzone to render medical services as to Ms. Goss. For example, Dr. Godsey was not awaiting Dr. Bazzone's opinion prior to proceeding with radiation treatment; Ms. Goss was no longer planning to seek Dr. Bazzone's opinion based on an actual visit and examination. On these facts then, whatever duty would arise from Dr. Bazzone's look *596 for curiosity's sake at the MRI would be that based on a potentially negligent failure to recognize the need to change the treatment plan. The treatment plan was for someone who was not his patient, to whom he was giving no medical treatment, and about whom he had given only a sidewalk consult. Dr. Bazzone was a stranger to the treatment of Ms. Goss and was consulted only for a possible referral.
¶ 34. In effect, the plaintiffs are arguing that it does not matter in tort law that Ms. Goss cancelled her appointment with Dr. Bazzone. The doctor's duties once he decided to look at the MRI are in their view the same whether she was a patient or not, which was a duty to use the proper standard of care and advise of any new opinion. That, at first blush, seems unreasonable, but we look further.
¶ 35. Remembering the guidance of Meena, at this point in the analysis we conduct the search for duty in a medical malpractice action as we would in a traditional tort action. Meena, 603 So.2d at 869-70. In traditional tort law there is no duty to aid one in peril. PROSSER AND KEETON ON TORTS § 56 (5th 1984) at 375. In essence, the heirs of Ms. Goss complain that Dr. Bazzone was in a position to examine the MRI non-negligently. Even if there were no expectation that he would advise Ms. Goss's treating physicians any further, once he undertook the review of the MRI, he was required to do so consistently with the standard of care. He might have saved her and did not. What that approach encounters is the general principle that doctors and others do not by the force of tort law, whatever other forces come into play, have an obligation to volunteer their assistance. "A physician is under no duty to answer the call of one who is dying and might be saved." Id.; see also Coleman v. Louisville Pants Co., 691 F.2d 762, 766 (5th Cir.1982)(volunteer has duty only if reliance). A failure to act in the absence of a relationship with a patient was not the issue of Meena.
¶ 36. The question is whether Dr. Bazzone had a duty to prevent future harm to Goss from unnecessary radiation treatment because he voluntarily picked up a file of a patient who cancelled an appointment. Ms. Goss was not relying on Dr. Bazzone for medical advice. Had the April 4 note remained only in the possession of Dr. Bazzone, the reasons for imposing a duty for non-negligent interpretation of the MRI examined out of curiosity would be even weaker. Yet, even though the note got to Dr. Godsey, and a cautionary message in the note might have changed Dr. Godsey's course, we do not find that a duty was created for Dr. Bazzone. We reach that conclusion because of some of the factors we outlined above from the treatise by Lee and Lindahl. We see the issue largely as one of counter productive burdens on the medical profession and on the desirability of encouraging open discussion and sharing of information among medical professionals. If any information gained, any opinion issued, any record that happens to come before a physician, could create liability not only for actions but for non-actions, then the burden on physicians and the community of creating that duty is too great. Allowing recovery would start us on a road that has no rational stopping point. This is not Meena, which was an affirmative ordering of a battery on a person who happened not to be the physician's patient. The road that Meena marked does not in our view extend as far as the plaintiffs would have us go in this case.
¶ 37. Nothing raised in this first issue undermines the directed verdict for Dr. Bazzone.
*597 ISSUE 2: Prima Facie Case for Negligence
¶ 38. We consider separately an issue concerning the directed verdict for Dr. Bazzone. Goss argues that the trial court's earlier denial of summary judgment for this doctor is at odds with the later order that granted a directed verdict. The order denying summary judgment stated this:
there is evidence before the court in the form of medical records and depositional testimony that could establish that Dr. Bazzone reviewed Marlene Goss' MRI, placed a diagnosis in her medical chart, recommended radiation therapy as a course of treatment, and advised against surgical confirmation. [references omitted] As to the allegations that Goss refused to see Dr. Bazzone, this is disputed by testimony. . . . Certainly, these disputed facts present questions of fact regarding Dr. Bazzone's assumption of a duty to Goss and any breach thereof that must be properly decided by a jury.
The trial court found that the issue of cause of death was also a proper question of fact for the jury. The evidence cited by the court in deciding these matters included the medical records, depositions of Goss's heirs, and an affidavit by a doctor who later properly diagnosed Ms. Goss's condition.
¶ 39. There is no difference between the standards employed in considering a summary judgment and a directed verdict. Breland v. Gulfside Casino Partnership, 736 So.2d 446, 448 (Miss.Ct.App. 1999). Both motions view the evidence in a light most favorable to the non-moving party. One practical difference between the two motions is that there is usually more information before the trial court in deciding a directed verdict as compared to summary judgment. In this case, the plaintiffs had finished the presentation of their case at the time of the grant of this dispositive motion. Every opportunity was therefore given them to make a prima facie case. Having refused to grant a summary judgment, the court was willing to give a directed verdict.
¶ 40. There is no principle of Mississippi law that the refusal to grant a summary judgment bars a later directed verdict on the same grounds. Here, the action for medical malpractice alleged that the defendants, including Dr. Bazzone, "deviated from the standard of care in the examination, treatment and care of Goss." For liability, all the elements of a tort action must be shown: duty, breach, causation, and damages. We have discussed already the problems arising from creating a duty on these facts. There was expert testimony that Dr. Bazzone breached the standard of care by prescribing and recommending radiation therapy without performing a biopsy. However, there was no expert testimony that his interpretation of the MRI was in breach of the standard of care, and there was no evidence that Dr. Bazzone's recommending radiation therapy without a biopsy was the proximate cause of the injury. In fact, Dr. Godsey testified that he did not base his decision to begin radiation treatment on any involvement Dr. Bazzone may have had, but based his decision on the findings of Dr. Barrett.
¶ 41. These facts may have been more clearly shown to the trial judge during trial than he believed them to be at the time of the summary judgment motion. We find nothing to undermine the grant of a directed verdict from the fact that the court had earlier denied a summary judgment.
ISSUE 3: New trial as to Dr. Godsey due to directed verdict and other irregularities
¶ 42. The administrator of the Goss estate also seeks to have us reverse and *598 remand for a new trial as to Dr. Godsey. Several different arguments are presented that we discuss under this issue.
¶ 43. First it is argued that the dismissal of the action against Dr. Bazzone prejudiced the case against Dr. Godsey. Cited is a precedent in which a trial court was found to have abused its discretion in severing a case for medical malpractice against two doctors. Kiddy v. Lipscomb, 628 So.2d 1355 (Miss.1993). The patient had first sought to have the defendant Dr. Lipscomb perform an abortion. Due to Dr. Lipscomb's failure to perform a successful abortion, she was later treated by another defendant, Dr. Chepko. Id. at 1356-57. The patient was then treated by other doctors. Chepko was also the criminal defendant in a highly publicized prosecution. Id. Upon Chepko's conviction, the civil trial judge granted Lipscomb's motion for a severance. Lipscomb later received a favorable jury verdict. Id. The court held that it was error to bifurcate the trial. Id. at 1358. Since the cases involved "the same nucleus of common facts and arise from the same transaction or occurrence . . ., the cases against the two doctors are too closely intertwined to warrant the time and expense of trying them separately." Id. at 1357-58. The court was concerned that Lipscomb would be able to argue that the injuries stemmed from the services the patient received under Chepko, and Chepko could argue that the injuries stemmed from the services received from Lipscomb. Id. Both doctors needed to be parties to make the issues of liability and damages determinable. Id.
¶ 44. In Kiddy, the court sought to prevent making an "empty chair" defense available to a second defendant in a case involving common facts. Dr. Godsey did not receive a favorable jury verdict by pointing to an empty chair. In fact, Dr. Godsey testified that he did not rely on Dr. Bazzone's opinion. Although Dr. Godsey testified that the radiation treatment would have stopped if Dr. Bazzone's April 4 note indicated the tumor was not cancerous, the note did not cause continued treatment. Goss would have received the full radiation treatment even if the April 4 note had never been written. So in effect, only if Dr. Bazzone had raised the need for a confirmatory biopsy, or had questioned his earlier interpretation of the MRI, was there a potential that Dr. Godsey would have stopped the radiation. We have already addressed the legal issues revolving around duty that resolve Dr. Bazzone's liability. His liability is separately determined from that of Dr. Godsey. Dr. Godsey did not strive to make it otherwise. Dr. Bazzone's absence from the questions of liability at the time of the jury deliberations did not prejudice the Goss heirs.
¶ 45. Goss argues that a new trial also is warranted because an incorrect page of a deposition was displayed on the first day of testimony. The page was unintentionally projected on a large screen and contained evidence that Ms. Goss had abused alcohol which had been excluded from trial. The jury was polled and nine jurors indicated they had seen the slide that contained the information. The court then gave the jurors a remedial instruction and each juror had to affirm that any information seen on the last slide displayed would be disregarded. The information displayed on the slide was unrelated to the issues of the case. The information may have tended to place Goss in a slightly less favorable light but did not affect the fairness of the trial.
¶ 46. Third, Goss argues that a new trial is warranted because of judicial misconduct. One day during the course of the trial, former Mississippi Supreme Court Justice Charles R. McRae sat in the audience. After the jury was dismissed *599 and the court recessed, the trial judge stepped down from the bench. Justice McRae entered the bar of the courtroom, and the trial judge welcomed him and shook his hand. Justice McRae pointed to Dr. Bazzone and said that they had played football together in college. The parties and their counsel were in the courtroom when this exchange took place. The trial judge and Justice McRae exited the courtroom and had a conversation that lasted a few minutes. There is evidence that the conversation did not involve the case or any parties.
¶ 47. These events were on a Wednesday. The following Monday, after Dr. Bazzone was granted a directed verdict, the Goss heirs moved for a mistrial and recusal due to these events.
¶ 48. A judge should recuse when the judge's "impartiality might be questioned by a reasonable person knowing all the circumstances or for other grounds provided in the Code of Judicial Conduct or otherwise as provided by law. . . ." Miss.Code Jud. Conduct Canon 3 E(1). The Goss heirs made no statutory or constitutional claims for recusal; the decision to recuse therefore was left to the discretion of the trial judge. In re Blake, 912 So.2d 907, 917 (Miss.2005). The decision of a judge not to recuse from a case is reviewed under an abuse of discretion standard. Id.
¶ 49. Here, the trial judge was confronted with the situation of a former senior member of the judiciary entering the courtroom. The judge cordially greeted the visiting former justice and they spent a few minutes in conversation together. No reason is given for the appearance of the former judge other than that he knew a defendant from their once playing football together. Plaintiff's counsel did not initially find it necessary to raise any objection. A challenge was made only after an unfavorable ruling for a directed verdict. This observed friendliness towards one of the parties in the case by a former member of the judiciary, and that judge then associating with the trial judge by their own private conversation, are the kind of events best avoided during the conduct of a trial. We find no basis for reversal, however, as we find no prejudice nor sufficiently prompt objection.
¶ 50. The jury's verdict and the court's judgment in favor of Dr. Godsey are affirmed.
Issue 4: Change of venue
¶ 51. The plaintiff argues that if we remand, we should order a change of venue. There is no argument that the conducting of the trial in Jackson County constituted independent reversible error. Since we affirm the judgment, this final issue is moot.
¶ 52. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
MYERS, P.J., GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J. LEE, P.J., NOT PARTICIPATING.
CHANDLER, J., Dissenting.
¶ 53. I respectfully dissent. I believe that the jury should have been allowed to determine the facts surrounding Dr. Bazzone's April 4 review of Goss's MRI, his issuing of a medical opinion thereon, and his placement of that opinion into Goss's permanent medical records. As I would hold that the jury was entitled to reject Dr. Bazzone's assertion that the dissemination *600 of the opinion was purely accidental, I would further address whether a duty should be imposed upon a physician who reviews a non-patient's MRI, issues a medical opinion thereon recommending a course of treatment, and places the opinion into the non-patient's medical records where it may be relied upon by other health care providers. I believe, in that circumstance, the physician should be held to a duty to conform to the standard of care in rendering the opinion. Moreover, I would find that Scafide presented sufficient evidence on the elements of breach and proximate cause to have enabled this case to reach the jury. Therefore, I would reverse the grant of a directed verdict as to Dr. Bazzone and remand for a jury trial. For the reasons expressed by the majority, I concur with its finding that Dr. Bazzone owed Goss no duty of care in his conversation with Dr. Ross about the treatment options for a presumed glioblastoma multiforme. This opinion pertains solely to Dr. Bazzone's conduct surrounding his review of Goss's MRI.
¶ 54. Our standard of review in appeals from the grant of a directed verdict is well-established. We are to review the grant of a directed verdict de novo, and must view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the non-movant. Windmon v. Marshall, 926 So.2d 867, 872(¶ 20) (Miss.2006). Considering the evidence in that light, we must reverse if the evidence creates a fact question on which reasonable jurors may disagree. Id.
¶ 55. While recognizing that "Rule 50 is a device for the court to enforce the rules of law by taking away from the jury cases in which the facts are sufficiently clear that the law requires a particular result," I disagree with the majority's assumption that the facts of this case were so clear that a particular result was required. M.R.C.P. 50 cmt. The majority accepts as fact Dr. Bazzone's testimony that it was for his own purposes that he reviewed Goss's MRI and then authored a written opinion embracing his findings and recommendations. The majority further accepts Dr. Bazzone's testimony that his placement of the opinion into Goss's medical records was purely accidental. Relying on this self-serving testimony from Dr. Bazzone, the majority interprets Dr. Bazzone's conduct as nonfeasance and applies the familiar negligence rule that the law imposes no duty to aid one in peril. The majority concludes that Dr. Bazzone owed no duty to Goss in reviewing Goss's MRI as an exercise for his own professional edification.
¶ 56. Perhaps, as Dr. Bazzone testified, he reviewed the MRI and drafted the April 4 opinion for his own purposes and the opinion's escape from his clinic simply was an unfortunate mistake. If that were a factual certainty, then I would find that Dr. Bazzone had no duty to comport with the standard of care in authoring an opinion on the MRI for his own personal use. However, viewing the evidence in the light most favorable to Goss, rather than to Dr. Bazzone, I would hold that the evidence was such that the jury was not required to accept Dr. Bazzone's testimony. There was evidence that, most likely after beginning radiation therapy, Goss dropped her MRI at Dr. Bazzone's office so that he could review it. There was no dispute that Dr. Bazzone reviewed Goss's MRI, authored a written opinion about her MRI that included treatment recommendations, and the opinion then was transmitted to Dr. Godsey and placed into Goss's medical records. Nothing on the opinion indicated that it was for Dr. Bazzone's personal or office use only; in fact, Dr. Godsey testified that he relied upon the opinion as corroboration for his own conclusions about Goss. From these facts, it may reasonably *601 be inferred that Dr. Bazzone did not author the opinion for his own private use, but did so with the intent to transmit his opinion and recommendations based on Goss's MRI to her treating physicians. The jury was entitled to make this inference and was not obligated, as the majority assumes, to accept Dr. Bazzone's testimony that the opinion's departure from his office and arrival in Goss's medical records was purely accidental.
¶ 57. In negligence law, the existence or non-existence of a duty is for determination by the Court. Foster v. Bass, 575 So.2d 967, 972 (Miss.1990). But when the question of whether a duty applies is dependant on the existence or non-existence of certain facts, that factual determination is properly resolved by the jury. Id. at 973 n. 7; see also W. Keeton, Prosser & Keeton on Torts, 320 (5th ed. 1984) ("[I]f the facts about the relationship between the parties are in dispute, the disputed issue as to which of various relationships existed is submitted to the jury."). Pursuant to this tenet, the facts surrounding Dr. Bazzone's drafting and dissemination of his opinion should have been submitted to the jury for determination.
¶ 58. Assuming that the fact-finder concluded that Dr. Bazzone drafted the opinion for dissemination to other doctors, the question becomes what duty, if any, should be imposed on a physician who gratuitously undertakes to review the MRI of another doctor's cancer patient, to issue a medical opinion thereon with treatment recommendations, and to place that opinion into the cancer patient's medical records where it may be relied upon by her treating physicians. Undisputedly, no traditional physician-patient relationship existed between Goss and Dr. Bazzone. However, in Mississippi, the existence of a physician-patient relationship is but one factor in determining "the type or nature of duty owed, if any, to the injured patient or non-patient." Meena v. Wilburn, 603 So.2d 866, 870 (Miss.1992). Taking the physician-patient relationship factor into consideration, I would determine the questions of whether a duty should be imposed in this case, and what that duty should be, with reference to ordinary tort principles.
¶ 59. "[T]he important component of the existence of the duty is that the injury is `reasonably foreseeable'. . . ." Rein v. Benchmark Const. Co., 865 So.2d 1134, 1143(¶ 29) (Miss.2004). While a person has no duty to volunteer, one who undertakes to act may be held to a duty of care in the undertaking. It has been stated that:
The law imposes upon every person who undertakes the performance of an act  which, it is apparent, if not done carefully, will be dangerous to other persons, or the property of other persons  the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or property which is directly attributable to a breach of such duty.
Dr. Pepper Bottling Co. of Miss. v. Bruner, 245 Miss. 276, 282, 148 So.2d 199, 201 (1962). A physician's rendering of a medical opinion, with treatment recommendations, and placement of that opinion into a person's medical records is the type of act that, if not done carefully, could result in harm to the person if and when the opinion is relied upon by other medical professionals. If, as here, there is nothing about the opinion that would restrict its use, then it is reasonably foreseeable that the opinion would be relied upon by other medical professionals treating the person. This is so regardless of the fact that the person is not the physician's patient; a physician's opinion in a person's medical records has the same potential to influence the person's *602 treatment as it would if the person were a patient. Therefore, I would find that a physician owes a duty to a non-patient when the physician purposely drafts a medical opinion, with treatment recommendations, and disseminates it to the non-patient's treating physicians or makes it a part of the non-patient's medical records.
¶ 60. For the same reason, I would find that reasonable care in this situation would demand the physician's adherence to the standard of care in rendering the opinion. "A defendant must only take reasonable measures to remove or protect against foreseeable hazards that he knows about or should know about in the exercise of due care." Donald v. Amoco Prod. Co., 735 So.2d 161, 174 (Miss.1999). Thus, the degree of care to be taken should be commensurate with the apparent risk of harm. The risk of harm is to be "appraised in terms of ordinary prudence and interpreted in light of the attendant circumstances." Supreme Instruments Corp. v. Lehr, 190 Miss. 600, 627, 1 So.2d 242, 245 (1941). In Century 21 Deep South Properties v. Corson, 612 So.2d 359, 374 (Miss.1992), the supreme court applied these principles in the context of legal malpractice. The court held that an attorney could incur legal malpractice liability to foreseeable third parties who, for a business purpose, detrimentally relied on the attorney's title work and suffered loss proximately caused by the attorney's negligence. Id. In so holding, the court stated that the client of another attorney performing a subsequent title update is entitled to rely upon the first attorney's title opinion and that "reliance on a licensed professional to perform his work competently is imminently reasonable." Id. The court cited Meena for the principle that the presence of an attorney-client relationship was merely a factor to be considered in determining the duty owed. Id. at 373.
¶ 61. The facts here may be analogized to those in Corson. Similarly to the situation in Corson, it is reasonable for medical professionals treating a person to rely upon another doctor's medical opinions and treatment recommendations found in the person's medical file. When disseminated to a person's treating physicians or placed in a person's medical file, a doctor's medical opinions and treatment recommendations have the capacity to cause harm through other professionals' reliance regardless of whether the subject of those opinions and recommendations is a patient or a non-patient. The risk of injury to a person from a physician's erroneous medical opinion and treatment recommendations is the same whether or not there is a traditional doctor-patient relationship. Certainly, the public has an interest in preventing medical opinions and treatment recommendations not conforming with the standard of care from populating people's medical records regardless of an individual person's status as a patient or non-patient of the opining physician. Accordingly, when a physician gratuitously undertakes to review the MRI of another doctor's patient, to issue a medical opinion thereon with treatment recommendations, and to place that opinion into the non-patient's medical records, the physician should owe the non-patient a limited duty to conform to the standard of care in rendering the opinion and treatment recommendations. That is, to the extent of rendering the opinion and treatment recommendations, the physician should exercise reasonable and ordinary care as would be exercised by a minimally competent physician in the same specialty or general field of practice throughout the United States. Palmer v. Biloxi Reg. Med. Ctr. Inc., 564 So.2d 1346, *603 1354 (Miss.1990).[1]
¶ 62. Having determined that Dr. Bazzone owed Goss a limited duty to conform to the standard of care of a minimally competent neurosurgeon in rendering the opinion and treatment recommendations which he placed in her medical records, I turn to the issues of breach and proximate cause. To prove a medical malpractice claim, a plaintiff must show: (1) the existence of a duty on the part of the physician to conform to a specific standard of conduct; (2) the specific standard of conduct; (3) that the physician's breach of the duty was the proximate cause of the plaintiff's injury, and (4) that damages resulted. Barner v. Gorman, 605 So.2d 805, 808-09 (Miss.1992). Dr. Fredericks provided expert testimony on the standard of care. Dr. Fredericks testified that Dr. Bazzone breached the standard of care by recommending radiation therapy without also recommending a diagnostic biopsy to confirm or refute what was shown by the MRI. Indeed, Dr. Bazzone's April 4 opinion recommended that Goss undergo radiation therapy and forego surgery. Dr. Bazzone testified that, by "surgery," he meant that Goss should forego excision of the entire tumor, and that he did not intend to signify that Goss should forego a biopsy. The question of how Dr. Bazzone's April 4 opinion should be construed was for the jury. Viewing the evidence in the light most favorable to Goss, I would find sufficient evidence existed of Dr. Bazzone's breach of the standard of care for the case to have survived the motion for a directed verdict.
¶ 63. In my opinion there was also sufficient evidence on the element of proximate cause. Concerning this element, Dr. Fredericks testified that Dr. Bazzone's opinion and recommendations would have proximately caused Goss's injuries and death from radiation therapy if there was reliance on the opinion and recommendations in the decision for Goss to proceed with radiation therapy without a biopsy. As set out by the majority, Goss's radiation therapy had already begun by the time Dr. Bazzone executed his April 4 opinion and, therefore, the April 4 opinion did not cause the radiation therapy to be administered. I believe the evidence and arguments below support a different approach to proximate causation in this case. In the area of medical malpractice, proximate cause can be shown if, but for the departure from the standard of care, there would have been "a greater than fifty (50) percent chance of a [substantially] better result than was in fact obtained." Harris v. Shields, 568 So.2d 269, 274 (Miss.1990) (quoting Ladner v. Campbell, 515 So.2d 882, 889 (Miss.1987)). Dr. Godsey testified that, when he read Dr. Bazzone's April 4 opinion, it lent credibility to Dr. Godsey's administration of radiation therapy to Goss. Dr. Godsey testified that, if Dr. Bazzone's opinion had not substantiated the earlier diagnosis and treatment recommendations for Goss, then he would have stopped the radiation therapy. Dr. Godsey testified that, as of April 4, Goss had *604 received only twenty percent of her radiation therapy, not enough to have significantly damaged her brain tissues. The jury could reasonably find that, had Dr. Bazzone's opinion and recommendations comported with the standard of care by recommending a biopsy before radiation therapy, then Dr. Godsey would have ceased Goss's radiation therapy and she would have been saved.
¶ 64. As I believe the majority errs by determining questions properly resolved by the jury, I respectfully dissent.
KING, C.J., JOINS THIS OPINION.
NOTES
[1] Notably, the Arizona case relied upon by the majority, Stanley v. McCarver, 208 Ariz. 219, 92 P.3d 849 (2004), reached a similar conclusion concerning the duty to be applied. That case involved a physician's failure to communicate adverse results of an x-ray to a non-patient whom the physician examined at the behest of the non-patient's potential employer. Id. at 850. After determining that the physician had assumed a duty of care to the non-patient when he undertook to read the non-patient's x-ray, the court defined the duty to be applied. Id. at 854. The court found that reasonable conduct in light of the apparent risk required the physician to "conform to the legal standard of care for one with his skill, training, and knowledge." Id.