ISHEE, J.,
for the Court:
¶ 1. This appeal arises from a September 13, 2010 order of the Rankin County Circuit Court, which granted the Appellees’ motion for summary judgment in a medical-malpractice action. Franklin Winfield brings two issues for our review: (1) whether the discovery rule tolled the statute of limitations and (2) whether a doctor- *976 patient relationship or duty of care existed. We find genuine issues of material fact exist regarding the statute of limitations and application of the discovery rule; therefore, summary judgment was not proper. Accordingly, we reverse on this issue and remand this case for further proceedings consistent with this opinion. However, we affirm the decision of the trial court regarding the doctor-patient relationship and duty of care.
FACTS AND PROCEDURAL HISTORY
¶2. In 1998, a life port and catheter were inserted into Winfield for the treatment of Hodgkin’s lymphoma. The life port and catheter were used to administer chemotherapy treatments. Several years after treatment began, Winfield entered remission, and it was decided that the life port should be removed. On April 10, 2003, Dr. S. Blair Faulkner removed Win-field’s life port and catheter.
¶ 3. On the day of the procedure, Win-field was injected in his right shoulder with Xylocaine, a local anesthetic. He was not given any sedative or general anesthesia. During the procedure, Dr. Faulkner mobilized the life port, as well as a portion of the catheter. Traction was then applied to remove the remaining portion of the catheter. This light traction fractured the catheter, leaving a residual piece in Win-field’s left pulmonary artery. Dr. Faulkner attempted to identify and retrieve the catheter, but was unsuccessful. Ultimately, Dr. Faulkner decided the residual piece would pose no threat and should be left in place. The nurse’s notes, written by Kim Bishop, indicate “it was felt the risk was close to 0 and the catheter would not be retrievable by radiographic means.” On the day of the surgery, Dr. Faulkner spoke with Dr. Norwood Smith, a radiologist, regarding the residual piece. The conversation occurred in the hallway of the hospital; both agreed the residual piece should be left in place and would not cause a risk for infection. This was the extent of Dr. Smith’s involvement.
¶4. According to Bishop’s notes, Win-field was informed about the residual piece on the day of the surgery. However, in his affidavit, Winfield alleges he “had no knowledge of any kind that [a] broken-off piece of tubing was left inside [his] chest.” He goes further to state, had he known about the residual piece, he “would have insisted that it be surgically removed.” Winfield asserts on appeal, as he did in his complaint, that he only learned about the residual piece because of his resulting health problems.
¶ 5. Several years after the procedure, Winfield began experiencing chest pain, shortness of breath, nausea, and vomiting. He was ultimately diagnosed with pulmonary embolism, deep-vein thrombosis, and pulmonary hypertension. Winfield went to Central Mississippi Medical Center (CMMC) several times over the period of approximately one month for treatment. During one admission in January 2007, he was informed that a piece of the fractured catheter remained in his left pulmonary artery. According to Winfield, this was the first time he had any knowledge about the fractured catheter piece. During his treatment at CMMC, an emergency-room doctor told Winfield he did not think the residual piece was causing Winfield’s current medical problems. Nonetheless, his health problems continued. In February 2007, Winfield was seen at the University of Mississippi Medical Center (UMMC). He received treatment from Dr. Wade Banker, Chief of Interventional Radiology at UMMC. Dr. Banker determined the residual piece could pose a health risk in the future and removed the catheter fragment in February 2007.
*977 ¶6. Filed on January 16, 2009, Win-field’s complaint alleges Crossgates River Oaks Hospital, Health Management Associates Inc., Dr. Faulkner, Dr. Smith, and Bishop were negligent in failing to retrieve the fractured catheter piece and for failing to advise Winfield of the presence of the fractured catheter piece. On February 8, 2010, Winfield filed a motion for partial summary judgment. He sought a ruling from the trial court as a matter of law that the statute of limitations had not run against him. He argued the “discovery rule” applied in this case because the act of negligence was not known or discovered until well after the fractured piece of catheter had initially become lodged in his chest. Limited discovery on the statute-of-limitations issue was then conducted.
¶ 7. Health Management Associates Inc., Brandon HMA Inc., and Bishop filed a cross-motion for summary judgment. Dr. Faulkner filed a joinder in their cross-motion for summary judgment. They argued the statute of limitations began to run on April 10, 2003; therefore, the complaint was time-barred because it was filed after the two-year statute of limitations had expired. Dr. Smith filed his own cross-motion for summary judgment. In addition to the statute-of-limitations issue, he sought judgment as a matter of law that no doctor-patient relationship existed and that he owed no duty to Winfield.
¶8. The trial court entered an opinion and order granting summary judgment. The trial court further found Winfield knew about the residual piece on the day of the surgery and did not exercise reasonable diligence in determining whether he had an actionable injury; therefore, the discovery rule did not apply, and Win-field’s suit was time-barred by the statute of limitations. The trial court, while acknowledging the point was moot based on the statute-of-limitations time bar, also found there was no doctor-patient relationship between Dr. Smith and Winfield; as such, Dr. Smith owed no duty to Winfield. From this ruling, Winfield appeals.
DISCUSSION
¶ 9. “The standard of review in considering on appeal a trial court’s grant or denial of summary judgment is de novo.” Sutherland v. Estate of Ritter, 959 So.2d 1004, 1007 (¶ 8) (Miss.2007) (citations omitted). Summary judgment is appropriate where, “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” M.R.C.P. 56(c). When determining whether summary judgment is appropriate, the evidence must be viewed in the light most favorable to the party against whom the motion was made. Sutherland, 959 So.2d at 1007 (¶ 8) (citation omitted). “Issues of fact sufficient to require a denial of a motion for summary judgment are obviously present where one party swears to one version of the matter in issue and the other party takes the opposite position.” Id. (citation omitted). However, “an adverse party may not rest upon the mere allegations or denials of the pleadings, but instead the response must set forth specific facts showing that there is a genuine issue for trial.” Id. (citation omitted). “If any triable issues of fact exist, the trial court’s decision to grant summary judgment will be reversed. Otherwise, the decision is affirmed.” Id. at 1007-08 (¶ 8).
I. Statute of Limitations and Discovery Rule
¶ 10. In granting summary judgment, the trial court found Winfield’s claim was barred by the two-year statute of limitations. Winfield argues the discovery rule *978 tolled the statute of limitations until early 2007. Mississippi Code Annotated section 15-1-36(2) (Rev.2003) states:
[N]o claim in tort may be brought ... for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.
¶ 11. While section 15-1-36(2) controls most medical-malpractice claims, a specific section applies to cases involving foreign objects left during surgery. Mississippi Code Annotated section 15-l-36(2)(a) states that “the cause of action shall be deemed to have first accrued at, and not before, the time at which the foreign object is, or with reasonable diligence should have been, first known or discovered to be in the patient’s body.” All of section 15-1-36(2) contains a “discovery rule,” and this rule controls cases where the act of negligence is not first known or is not discovered until much later.
¶ 12. “The discovery rule tolls the statute of limitations until a plaintiff should have reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent.” Neglen v. Breazeale, 945 So.2d 988, 990 (¶ 7) (Miss.2006) (citations omitted). To benefit from the discovery rule, one must “be reasonably diligent in investigating his or her injuries.” Id. at 990-91 (118). In addition, the discovery rule only applies to latent injuries. Id. at 991 (¶ 8). A latent injury is defined as one that precludes the plaintiff “from discovering harm or injury because of the secretive or inherently undis-coverable nature of the wrongdoing in question or when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act.” Id.
¶ 13. The trial court, in granting summary judgment, found “the statute of limitations began to run on April 10, 2003, the date of the initial operation.” However, we find the pleadings, depositions, answers to interrogatories, and affidavits show genuine issues of material fact exist regarding the date on which Winfield was told about or discovered the existence of the residual piece. While Bishop’s notes indicate Winfield was told about the residual piece on the day of the surgery, Win-field maintains in his affidavit that he “had no knowledge of any kind that [a] broken-off piece off catheter tubing was left inside [his] chest.” He further stated that had he known about the fractured piece he would have insisted it be removed. In his deposition on March 29, 2010, Winfield claimed he had no memory of talking to Dr. Faulkner, the nurse, or anyone from the hospital before or after the surgery. He also stated he could not remember anything because he was “pretty out of it.” This contradicting evidence establishes a genuine issue of material fact exists regarding the date on which Winfield knew about the residual piece; thus, there also exists a genuine issue of material fact regarding the date that the statute of limitations began to run. Because of these triable issues of material fact, we find summary judgment was not appropriate.
¶ 14. Furthermore, these triable issues of fact may require application of the discovery rule. In finding the discovery rule did not apply, the trial court stated: “The evaluation of reasonable diligence turns on the facts of a particular case and with the case at bar, [Winfield] has been on constructive notice since the day of the initial procedure[.]” However, if Winfield did not know about the residual piece on the day of the surgery, the discovery rule would have tolled the statute of limitations *979 until early 2007 when he was told about the fractured catheter piece.
¶ 15. Because genuine issues of material fact exist regarding the date Winfield knew about or discovered the existence of the residual piece, we find summary judgment on this issue was not proper. Accordingly, we reverse the trial court’s grant of summary judgment and remand this case for further proceedings consistent with this opinion.
II. Doctor-patient Relationship and Duty of Care
¶ 16. Winfield asserts a doctor-patient relationship existed between himself and Dr. Smith through Dr. Smith’s participation in the diagnosis, treatment, and discharge of Winfield from the hospital. Winfield also asserts, apart from the doctor-patient relationship, that Dr. Smith owed him a duty of reasonable care. Finally, Winfield argues this issue was premature, and it was improperly brought before the trial court because all parties entered into an agreed order limiting discovery to the statute-of-limitations issue.
A. Existence of a Doctor-patient Relationship
¶ 17. The first issue we will address is whether a doctor-patient relationship existed between Winfield and Dr. Smith. In order to make a prima facie case of medical malpractice, the plaintiff: Hill v. Mills, 26 So.3d 322, 329 (¶ 21) (Miss.2010) (quoting Troupe v. McAuley, 955 So.2d 848, 856 (¶ 22) (Miss.2007)). While a doctor-patient relationship is still considered one element in making a prima facie case of medical malpractice, a duty may arise even in the absence of such a relationship. Meena v. Wilburn, 603 So.2d 866, 869-70 (Miss.1992). However, finding a duty in cases where no doctor-patient relationship exists, “remains the exception and not the norm.” Scafide v. Bazzone, 962 So.2d 585, 593 (¶ 21) (Miss.Ct.App.2006).
(1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identify! ] and articulare] the requisite standard of care; and (3) establish!] that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician’s noncompliance with the standard of care caused the plaintiffs injury, as well as proving (5) the extent of the plaintiffs damages.
¶ 18. It is clear that no doctor-patient relationship existed in this case. The extent of Dr. Smith’s involvement was a hallway conversation between himself and the treating physician, Dr. Faulkner, where Dr. Smith simply agreed with a course of treatment for Winfield based on the diagnoses he was provided. Dr. Smith was not Winfield’s physician, and he never had any relationship with Winfield. He never accepted Winfield as his patient; he never examined or treated Winfield; and he did not review or interpret any of Win-field’s films or test results. In fact, Win-field admitted in his oral deposition that he did not even know who Dr. Smith was on the day of the surgery. Furthermore, Dr. Smith had no contract with Winfield and received no compensation for his conversation with Dr. Faulkner. We find that no doctor-patient relationship existed between Winfield and Dr. Smith.
B. Duty of Care
¶ 19. The next issue we will address is whether Dr. Smith owed a duty of care to Winfield despite the absence of a doctor-patient relationship. As noted above, a doctor-patient relationship is not critical to finding that a duty of care exists. In a negligence action, a doctor may be held liable if “the traditional elements— *980 duty, breach of duty, causation, and injury — are evidenced [a]nd such liability is not negated by the absence of a doctor-patient relationship.” Meena, 603 So.2d at 869-70. To determine whether a duty is owed, this Court must ask “ ‘whether the plaintiffs interests are entitled to legal protection against the defendant’s conduct,’ rather than focusing solely on the level of relationship between [the] parties.” Scafide, 962 So.2d at 592 (¶ 21) (quoting PROSSER AND KEETON ON TORTS § 53, 356-58 (5th ed. 1984)).
¶20. In Meena, a treating physician asked his partner, Dr. Albert L. Meena, to remove the surgical staples of one of his patients while he was away. Meena, 603 So.2d at 867-68. Meena accidentally directed a nurse to remove the surgical staples from the wrong patient. Id. at 868. After the surgical staples were improperly removed, the patient experienced significant health problems. Id. The Mississippi Supreme Court found, although no doctor-patient relationship existed, the non-treating physician, Dr. Meena, had breached the duty of care owed to the patient. Id. at 870. There are significant factual distinctions between the actions taken by the doctor in Meena, directing a medical procedure be performed on the wrong patient, and the actions taken by Dr. Smith in this case. However, this Court has previously addressed a case similar to the one at hand.
¶ 21. In Scafide, the treating physician, Dr. Dianne Ross, telephoned a local neurosurgeon, Dr. Victor Bazzone, inquiring about a course of treatment for her patient, Marlene Goss. Scafide, 962 So.2d at 588 (¶ 3). During their phone conversation, Dr. Ross described the patient’s diagnosis and asked for Dr. Bazzone’s treatment recommendation. Id. Dr. Bazzone provided Dr. Ross with his treatment recommendation without ever seeing the patient or reviewing any files. Id. An appointment was scheduled for Goss to see Dr. Bazzone, but Goss cancelled the appointment before seeing the doctor. Id. at 589 (¶ 6). Eventually, Dr. Bazzone received and reviewed Goss’s MRI scans. Id. at (¶ 8). Dr. Bazzone then wrote a note stating that he maintained his original position on the diagnosis and treatment of Goss. Id. Although Dr. Bazzone intended to keep the note solely in his possession, the note ended up in Goss’s medical file. Id. at (¶ 9). Ultimately, the initial diagnosis was incorrect, and the subsequent radiation treatment resulted in Goss’s death. Id. at (¶ 10). This Court found Dr. Baz-zone owed no legal duty to Goss. Id. at 596 (¶ 36). In determining there was no duty owed in that case, this Court noted Dr. Bazzone had “never considered Ms. Goss his patient, did not undertake treatment of her, and was not given the responsibility by another doctor of examining medical records.” Id. at 591 (¶ 16).
¶22. As in Scafide, Dr. Smith’s conduct consisted of no more than agreeing with the treating physician regarding the treatment of his patient. Dr. Faulkner consulted Dr. Smith in the hallway of the hospital on the day of the medical procedure. Dr. Smith was provided with factual information regarding the catheter fragment, and based on this information, he merely agreed with Dr. Faulkner’s assessment. Dr. Smith never saw Winfield, never reviewed Winfield’s file, and never suggested any treatment for Winfield.
¶ 23. Imposing a duty for the type of conduct in this case would discourage doctors from consulting one another and bene-fitting from the experience of others. Doctors have a responsibility to “pursue continually the acquisition of new knowledge by reading, attending conferences and courses, and consulting colleagues.” Scafide, 962 So.2d at 593 (¶ 23) (quoting 1 *981 STEVEN E. PEGALIS, AMERICAN LAW OF MEDICAL MALPRACTICE SD, 204 (2005)). Public policy encourages such conversations, and imposing liability for these conversations would “discourage doctors from giving informal advice, which in turn would decrease the occasions in which doctors would uphold this beneficial professional standard of seeking the advice.” Id. Accordingly, we find that Dr. Smith owed no legal duty of care to Win-field.
¶ 24. Finally, Winfield argues that the issues of doctor-patient relationship and duty of care were premature and that they were improper to have been brought before the trial court because all parties entered into an agreed order limiting discovery to the statute-of-limitations issue. Thus, he claims only the statute-of-limitations issue should have been addressed during summary judgment. However, “[a]n issue must first be presented to the trial court before it is raised to the appellate court.” Corporate Mgmt., Inc. v. Greene County, 28 So.3d 454, 462 (¶ 22) (Miss.2009) (citing Wilburn v. Wilburn, 991 So.2d 1185, 1191 (¶12) (Miss.2008)). Any issue “not raised at the trial court and which the trial court had no opportunity to rule on cannot be raised for the first time in the appellate court.” Id. (citing Fitch v. Valentine, 959 So.2d 1012, 1021 (¶ 19) (Miss.2007)). While Winfield argued in his response to the cross-motion for summary judgment filed by Health Management Associates, Brandon HMA, and Bishop that the issue of causation was premature and outside of the scope of the agreed order limiting discovery, he never raised either argument in regard to Dr. Smith’s cross-motion for summary judgment. Because Winfield never raised this issue in the trial court, and the trial court never had the opportunity to rule on the issue, he is procedurally barred from arguing the issues of doctor-patient relationship and duty of care were premature and improper to have been brought before the trial court during summary judgment.
CONCLUSION
¶ 25. For the reasons set forth above, we find summary judgment on the statute-of-limitations issue was not appropriate and reverse the trial court’s decision. However, on the subsequent issues, doctor-patient relationship and duty of care, we affirm the judgment of the trial court. We remand this case for further proceedings consistent with this opinion.
¶ 26. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEES, BRANDON HMA INC.; HEALTH MANAGEMENT ASSOCIATES INC.; S. BLAIR FAULKNER, M.D.; AND KIM BISHOP, R.N.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS AND MAXWELL, JJ„ CONCUR. RUSSELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, P.J. CARLTON AND FAIR, JJ., NOT PARTICIPATING.