# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-00572-SCT

*JENNIFER McILWAIN, INDIVIDUALLY AND FOR AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF HUNTER McILWAIN, A MINOR, DECEASED*

*v.*

*NATCHEZ COMMUNITY HOSPITAL, INC., JENNIFER VERMAELEN RUSS, M.D., NATCHEZ PEDIATRIC CLINIC, PLLC., AND MICHAEL L. WHEELIS, M.D.*


| | |
|---|---|
| DATE OF JUDGMENT: | 03/06/2013 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| TRIAL COURT ATTORNEYS: | R. MARK HODGES |
| | R. BRITTAIN VIRDEN |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | EVERETT T. SANDERS |
| | CLAUDE PINTARD |
| | SCOTT J. PINTARD |
| ATTORNEYS FOR APPELLEES: | CLIFFORD C. WHITNEY, III |
| | R. E. PARKER, JR. |
| | L. CARL HAGWOOD |
| | CARRIE RICE McCORMICK |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED IN PART, REVERSED IN PART, AND REMANDED - 09/03/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND COLEMAN, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    This is a medical malpractice case involving the death of two-year-old Hunter McIlwain. Plaintiff filed against two doctors and their respective employers; however, because only claims of vicarious liability were alleged against the employers, we will discuss the doctors only. We affirm the trial court's grant of Dr. Russ's Motion for Judgment Notwithstanding the Verdict (JNOV), because Plaintiff's expert failed to articulate the standard of care for a minimally competent pediatrician. However, we find that the trial court improperly granted Dr. Wheelis's motion for JNOV. We reverse that judgment of the trial court and remand for a new trial.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

¶2.    In the early morning hours of June 18, 2001, Dusty McIlwain brought his two-year-old son Hunter to the Natchez Community Hospital emergency room because Hunter had been vomiting, crying, and complaining of pain. Dr. Michael Wheelis, the emergency room doctor, knew Dusty and previously had worked with Carol McIlwain (a nurse), Dusty's mother and Hunter's grandmother. Dr. Wheelis was aware that Hunter had suffered a subarachnoid hemorrhage previously as a result of a motor vehicle accident. That night, Dusty and Carol McIlwain informed Dr. Wheelis only that Hunter had abdominal pain and had vomited. Dr. Wheelis did not observe any neurological symptoms.

¶3.    Dr. Wheelis testified that the triage nurse took a medical history when Hunter was first brought to the ER. Dr. Wheelis testified that he also took a history. Wheelis testified that the nurse noted the prior accident on the triage form. Under past medical history, Dr. Wheelis noted that Hunter had suffered a subarachnoid hemorrhage from a motor vehicle accident

2

prior to June 2001. Dr. Wheelis also made a notation about a "subarachnoid bleed" in a blank space on the form. After Dr. Wheelis conducted a physical examination of Hunter, he made a preliminary diagnosis of "possible new onset of diabetes. Gastroenteritis." His differential diagnosis was "gastroenteritis, new onset diabetes and dehydration." Dr. Wheelis ordered lab work and chest and abdominal x-rays. Dr. Wheelis did not order a computerized axial tomography (CT) scan of Hunter's head. Dr. Wheelis's recorded impressions were acute abdominal pain, dehydration, hyperglycemia,[1] hypokalemia.[2] Dr. Wheelis conceded at trial that Hunter had no diarrhea, a common symptom of gastroenteritis, while at home in the care of his father and grandmother, nor in the few hours Hunter was observed in the emergency room.

¶4.     After deciding that Hunter should be kept overnight in the hospital for observation, Dr. Wheelis, who had no authority to admit patients, spoke with Dr. Russ, a pediatrician, at the request of the family, at approximately 2:10 a.m. After conferring, Drs. Russ and Wheelis diagnosed Hunter with dehydration and gastroenteritis.

¶5.     In the orders signed by Dr. Wheelis, he instructed that Hunter's vital signs should be checked, at a minimum, every four hours. Hunter was admitted at 2:30 a.m. to a regular floor in the hospital. At 7:35 a.m., Hunter was found nonresponsive and twitching, with a temperature of 103 degrees. Nursing personnel paged Dr. Jennifer Russ, and she arrived at the hospital at approximately 7:54 a.m.

---

[1] High blood sugar.

[2] Low potassium.

3

¶6.     By the time she arrived at the hospital, Dr. Russ noted that Hunter's temperature was 103.1, he was tachycardic, and his blood pressure was almost undetectable. A code blue was called at approximately 8:06 a.m. Dr. Russ intubated Hunter because he was having trouble breathing. Hunter was then moved to the intensive care unit (ICU).

¶7.     Believing that Hunter suffered from sepsis due to a ruptured appendix, Dr. Russ consulted Dr. Keith Smith,[3] who chose to do an exploratory laparotomy. Although there was nothing wrong with Hunter's appendix, Smith removed it during surgery.[4]

¶8.     At that point, Dr. Russ became concerned about meningitis. Before she could order a spinal tap to test for meningitis, Dr. Russ was required to order a CT scan of Hunter's head to make sure he did not have increased intracranial pressure. The CT scan was ordered at approximately 11:35 a.m. Dr. Russ received the results at approximately 2:45 p.m.

¶9.     A subarachnoid bleed was discovered following the CT scan of Hunter's head. After the bleed was discovered, Dr. Russ began the process of transferring Hunter to the pediatric intensive care unit (PICU) at the University of Mississippi Medical Center (UMMC).

¶10.    Hunter was transferred to UMMC at 4:00 p.m. and arrived at approximately 7:40 p.m. Upon arrival, Hunter's Glasgow Coma Scale was three, and his pupils were unreactive. The UMMC staff determined that the "C.T. of the head obtained, because – was being considered secondary to suspicion of meningitis. C.T. reveals blood in third and fourth ventricle. There

---

[3] Dr. Smith, initially a defendant in this case, was granted summary judgment and was dismissed.

[4] There was no confirmation by any witness that Hunter did, in fact, suffer from sepsis.

was additional density between the interior lobe suggestive of an aneurysm." After Hunter's condition failed to improve, Hunter was pronounced dead at 11:08 a.m. the next morning.

¶11.   On September 4, 2002, Jennifer McIlwain, Hunter's mother and Dusty's ex-wife, filed suit in the Circuit Court of the First Judicial District of the Hinds County against Natchez Community Hospital, Dr. Russ, Natchez Pediatric Clinic, Dr. Wheelis, Dr. Smith, and another doctor.[5] The only claims alleged against the hospital and clinic were claims of vicarious liability.

¶12.   On September 13, 2007, this matter was transferred to the Adams County Circuit Court. Trial commenced on November 6, 2012, more than ten years after the suit had been filed. After a week-long trial and an extended period of deliberation, the jury announced that it was  deadlocked six-to-six. The trial court declared a mistrial.

¶13.   Following entry of the Order of Mistrial, the defendants filed motions for judgment notwithstanding the verdict (JNOV), arguing that Jennifer McIlwain had failed to establish her burden of proof as to the issue of causation. The trial court granted the motions and entered a final judgment of dismissal as to all claims in favor of all defendants. Jennifer timely filed this appeal, raising the following issues:

  I.    Whether the trial court erred in granting defendants' motion for a judgment notwithstanding the verdict after the hung jury.

  II.   Whether the trial court abused its discretion in denying plaintiff a fair trial.

        A.    Whether the trial court permitted the introduction of collateral, prejudicial, and irrelevant evidence.

---

[5] That doctor was not named as a defendant in the First Amended Complaint.

B. Whether the trial court erred in limiting the evidence on the present net cash value of Hunter McIlwain's life.

The defendants argue that the trial court properly granted their motions for JNOV because Jennifer had failed to establish causation and to articulate a violation of the standard of care.

**ANALYSIS**

¶14. The standard of review for a trial court's grant of a motion for JNOV is *de novo*. ***Bus. Commc'ns, Inc. v. Banks***, 90 So. 3d 1221, 1224 (Miss. 2012) (citing ***Watts v. Radiator Specialty Co.***, 990 So. 2d 143, 150 (Miss. 2008)). A motion for JNOV is a "challenge to the legal sufficiency of the evidence." ***United Servs. Auto. Ass'n (USSA) v. Lisanby***, 47 So. 3d 1172, 1176 (Miss. 2010) (citing ***Adcock v. Miss. Transp. Comm'n***, 981 So. 2d 942, 948 (Miss. 2008)). "We are required to view the evidence in the light most favorable to the nonmoving party." ***Mollaghan v. Varnell***, 105 So. 3d 291, 300 (Miss. 2012). "In essence, judgments as a matter of law present both the trial court and the appellate court with the same question–whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." ***White v. Stewman***, 932 So. 2d 27, 32 (Miss. 2006). Judgments as a matter of law test the legal sufficiency of that litigant's case. ***Id.***

**I. Whether the trial court erred in granting defendants' motion for a judgment notwithstanding the verdict after the hung jury.**

¶15. In order to establish a *prima facie* case of medical negligence, the plaintiff must prove the following elements:

(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the

defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and; (4) the plaintiff was injured as a result.

***Mid-South Retina, LLC v. Conner***, 72 So. 3d 1048, 1050-51 (Miss. 2011) (quoting

***McDonald v. Mem'l Hosp. at Gulfport***, 8 So. 3d 175, 180 (Miss. 2009); ***Delta Reg'l Med.***

***Ctr. v. Venton***, 964 So. 2d 500, 504 (Miss. 2007)) (other citations omitted).

¶16.   We examine whether Jennifer established the aforementioned elements as to each

defendant. As to Dr. Wheelis, we find that the Plaintiff offered sufficient evidence of the

requisite elements, and the trial court's grant of the motion for JNOV was improper.

However, as to Dr. Russ, the standard of care and putative breaches of duty articulated by Dr.

Miller failed to conform to our established law. The trial court properly granted the motion

for JNOV as to the claims alleged against Dr. Russ.

  *A. Dr. Wheelis*

¶17.   In response to interrogatory requests, Jennifer designated Dr. David Wiggins as an

expert and informed the defendants that he was expected to testify:

  to a reasonable degree of medical certainty that . . . [Dr.] Michael Wheelis . . . . breached the applicable standard of care regarding [his] treatment of Plaintiff's decedent, and that the breach of said standard of care caused or contributed to the death of Plaintiff's decedent.

As to Dr. Wheelis,[6] Dr. Wiggins opined four breaches: (1) failure to perform an adequate

history; (2) failure to perform an adequate physical exam; (3) failure to order the appropriate

tests; and (4) failure to make the proper diagnosis. Dr. Wiggins further opined that a head

---

[6] In the discovery phase, Dr. Wiggins also was designated to offer testimony against Dr. Russ. However, at trial, Jennifer's replacement expert, Dr. Truly, offered testimony only against Dr. Wheelis.

CT, which would have been "indicated in a severely ill child with a history of subarachnoid hemorrhage, . . . might have revealed the presence of a subarachnoid hemorrhage." Dr. Wiggins opined that, had Dr. Wheelis made the proper diagnosis, Hunter would have been treated earlier, would not have undergone an unnecessary exploratory laparotomy, and would have been admitted to the ICU where he could have been closely monitored. Dr. Wiggins concluded that the "delay in recognizing the patient's deteriorating status delayed treatment, thus prolonging the pathological conditions and almost certainly worsening the outcome."

¶18.    Approximately six weeks before trial, Jennifer moved to designate an expert out of time, stating that Dr. Wiggins was unavailable to testify at trial. Following a motion hearing, the trial judge ruled that:

> What the Court is going to do is to allow partially what plaintiff is requesting. But this Court – as I said, it's always a matter of fairness within the rules. Now, you will be allowed to designate a new expert, but this expert cannot go outside what has already been disclosed by this prior expert. In other words, there's no new surprises or anything like that. That's a matter of fairness, and with the aging of this case – in other words, the new expert will not be allowed to give any opinions which are outside of what has already been designated. In other words, I'm giving you an opportunity, because of the time from this prior designation, to get a replacement expert, not a new expert. . . . But it won't be like we're starting off with a new expert where you find out what he's going to say, because the expert will be limited to the opinions and the facts and basis for it that's already been disclosed.

The court memorialized his finding in an order granting Jennifer's motion to designate an expert out of time, "provided . . . that the opinions of the newly designated expert shall not differ from the opinions disclosed previously for Dr. Wiggins in scope, substance, basis, or in any other material respect. . . ."

¶19. Dr. William Truly, a physician in family and emergency medicine, testified at trial. Dr. Truly was accepted as an expert in emergency-room medicine without objection by defendants. Dr. Truly testified that his testimony was based on a reasonable degree of medical certainty and that, based on his knowledge, education, training, and experience, he was aware of what was required of a minimally competent emergency-room physician.

¶20. Dr. Truly testified that he disagreed with Dr. Wheelis's impression of gastroenteritis because Hunter had no evidence of diarrhea. Dr. Truly also testified that, with a child who has a history of an intracranial bleed and who presents with vomiting, the standard of care would have been to perform a C.T. scan of the head. Dr. Truly testified that Dr. Wheelis did not perform a C.T. scan of the head and further testified, over objection by the defendants, that Wheelis's failure was a deviation from the standard of care, and such deviation contributed to Hunter's death. Dr. Truly further testified that there was a failure to properly diagnose on the part of Dr. Wheelis and his failure to diagnose was a breach of the standard of care.

¶21. Dr. Wheelis's brief offers a side-by-side comparison of Dr. Wiggins's designated testimony *vis-a-vis* what Dr. Truly testified to at trial. The wording used by each doctor is not an exact replication. However, the issue to be determined is whether Dr. Wheelis was prejudiced by Dr. Truly's C.T. testimony. There can be no doubt that Dr. Wheelis was on notice that Dr. Wiggins would testify as to breach and causation, specifically that the failure to order a timely C.T. scan was a breach of the standard of care, and that a C.T. scan should have been ordered by Dr. Wheelis, given Hunter's history.

9

¶22. Dr. Truly's testimony discussed above was within the parameters of the designation in offering an opinion that Dr. Wheelis's failure to order a C.T. scan on a child with a history of an intracranial bleed resulted in the initial misdiagnosis. While parts of Dr. Truly's testimony did not recite verbatim Dr. Wiggins's designation, the parameters of Dr. Truly's testimony are markedly similar, ultimately opining, as did Dr. Wiggins, that Dr. Wheelis's breach of the standard of care contributed to or caused Hunter's death. Therefore, we find that the trial court erred in granting a JNOV in favor of Dr. Wheelis.

¶23. In his order granting the motions for JNOV, the trial judge specifically stated "that as to the issue of causation, the Plaintiff failed to establish its burden of proof as required by law." The trial judge made no other finding or explanation. This Court is troubled by the trial court granting JNOV instead of granting a new trial. Trial courts have three options when motions for JNOV are made: (1) deny the motion and try the case to a verdict; (2) grant the motion and enter a judgment for the moving party; or (3) grant a new trial. *White v. Stewman*, 932 So. 2d 27, 32 (Miss. 2006) (internal citation omitted). "[A] new trial becomes appropriate when a trial court determines that error within the trial mechanism itself has caused a legally incorrect or unjust verdict to be rendered." *White*, 932 So. 2d at 33. Courts have granted new trials "whenever convinced, from the evidence, that the jury has been partial or prejudiced, or has not responded to reason upon the evidence produced." *Beard v. Williams*, 172 Miss. 880, 884 161 So. 750, 751 (1935). A new trial may be necessary if mistakes were made in conducting the trial or in applying the law. *White*, 932 So. 2d at 33.

10

¶24. Because we find that the trial court erred by granting Dr. Wheelis's motion for JNOV, we reverse the judgment of the trial court in part and remand for a new trial as to Dr. Wheelis.

> A new trial provides a clean slate. The issues must be retried, and the parties may thus present evidence differently. As such, a new trial requires its own law, and the judge is once again empowered to make judgments concerning Mississippi law as required by the evidence.

*White*, 932 So. 2d at 33-34.

### B. Dr. Russ

¶25. Dr. Carol Miller was accepted as an expert in the field of pediatrics. Although Dr. Miller stated that her testimony would be based upon a reasonable degree of medical certainty and that she was familiar with the standard of care required of a minimally competent pediatrician, she opined that the standard of care required Dr. Russ to examine Hunter within one hour of his admission. That testimony was based on Dr. Miller's thirty years' experience in a teaching hospital in San Francisco, California. But on cross-examination, Dr. Miller conceded that the one-hour rule was based on that "hospital['s] medical staff bylaws" and from the "various hospitals over the thirty years that [she] has worked." She testified that she did not review the bylaws of either Natchez Community Hospital or Natchez Regional Medical Center. Additionally, she could not cite any specific authority, publication, text, treatise, or peer-reviewed article in support of her opinion regarding a one-hour rule.

¶26. "Mississippi physicians are bound by nationally-recognized standards of care. . . ," and not institution-specific standards which may exceed the nationally recognized standard

11

of care for minimally competent physicians. ***Palmer v. Biloxi Reg'l Med. Ctr., Inc.***, 564 So. 2d 1346, 1354 (Miss. 1990) (quoting ***Phillips v. Hull***, 516 So. 2d 488, 491 (Miss. 1987); ***Hall v. Hilbun***, 466 So. 2d 856 (Miss. 1985); ***King v. Murphy***, 424 So. 2d 547 (Miss. 1983)). Physicians have a "duty to employ 'reasonable and ordinary care' in their treatment of patients." ***Id.*** Our law requires a plaintiff "to establish–through a qualified expert–what is required of a minimally competent [physician], 'whose skills and knowledge are sufficient to meet the licensure or certification requirements for the profession or specialty practiced.'" ***Braswell v. Stinnett***, 99 So. 3d 175, 179 (Miss. 2012) (quoting ***McCarty v. Mladineo***, 636 So. 2d 377, 381 (Miss. 1994)). Our law does not require meeting the standards and protocols of an unknown institution in an unknown locale, unless it can be shown they are one and the same. No evidence was offered of such.

¶27. Dr. Miller failed to establish that the nationally recognized standard of care was one and the same as that of the San Francisco teaching hospital. As Dr. Miller's testimony fell short of establishing the standard of care applicable to Dr. Russ, no further analysis is required. We affirm the trial court's grant of Dr. Russ's motion for JNOV.

## II. Whether the trial court abused its discretion in denying Plaintiff a fair trial.

### A. Whether the trial court permitted the introduction of collateral, prejudicial, and irrelevant evidence.

¶28. The dynamic of this family is extremely contentious. Jennifer and Dusty are no longer married. Dusty refused to have any part of this lawsuit, claiming that the doctors did everything properly, even though he and his mother, a former registered nurse, failed to tell

the doctors that Hunter had bumped his head on a church pew earlier that morning. Dusty's and his family's testimony focused on the alleged wrongdoings of Jennifer and her responsibility surrounding the car accident months prior.

¶29.  Jennifer sought to exclude evidence of the facts surrounding the automobile accident which had occurred approximately ten months prior to Hunter's death. The defendants initially sought to introduce evidence that Jennifer was driving the car and that Hunter was unrestrained. The defendants argued that the reason the prior car accident was relevant was because Hunter had suffered a subarachnoid bleed as a result. The defendants also argued that Jennifer did not take Hunter to a follow-up appointment, which might have revealed an aneurysm or rebleed.

¶30.  In response, the trial judge acknowledged that this action was a medical negligence case and the issue to be determined was the standard of care rendered by Drs. Wheelis and Russ. The trial judge ruled that "[t]he fact that there was some type of injury if you can show that by the evidence that affects what happened or how the child was treated, then that will be dealt with by the Court." The trial judge stated that if Hunter had suffered a previous injury to the head, the defendant would be allowed to introduce evidence regarding the injury. However, he also stated any evidence regarding fault for the accident would not be allowed.

> And there are not to be any questions giving into the driving, the circumstances of the accident or things of that nature. However, it is probative – I have ruled about the injury that the child suffered on this occasion. Reason being because there's a lot of testimony about what [effect] that had in the following months leading up to the death of Hunter McIlwain. Therefore, the defendants will be allowed to elicit testimony as to whether or not he was in the car seat and

13

whether or not the plaintiff, Ms. Patterson, McIlwain, made any statements to this witness in regard to that, but it will be limited to whether the child was in the . . . car seat or not . . . . I don't want to hear fault.

The trial judge ultimately allowed questions to be asked about whether the child was unrestrained, holding such testimony went to the severity of the injury.

¶31.	On direct examination, Jennifer testified that, as a result of a car accident in 2000, Hunter was taken to a hospital in Jackson. She stated that she did not remember missing any appointments in Jackson. On cross-examination, Jennifer testified that Hunter was restrained in his car seat in the back seat of the car when the accident occurred.

¶32.	Donnie McIlwain, Dusty's brother, was allowed to testify, over objection, as to the damage done to Jennifer's car after the car accident. He testified that he saw a crack on the inside of the windshield to the right of the steering wheel, closer to the passenger side. He testified that, after further examination, he noticed what appeared to be hairs in the crack. On cross-examination, Donnie admitted that he did not know what happened to the windshield.

¶33.	Dusty McIlwain testified that Jennifer had told him Hunter was not restrained in a car seat at the time of the accident. He stated that he did not inform any medical personnel because his focus was on his son. Dusty testified that he was not aware of any follow-up appointments because Jennifer had not informed him of any. Dusty testified that when he observed Jennifer's car after the accident, he noticed a "grapefruit sized indention on the passenger side of the windshield, right above the glove box area, indented from the inside out." Dusty testified that, during church the Sunday before Hunter died, he bumped the back of his head on a padded pew.

¶34. The trial judge, in his ruling, properly limited testimony of the accident to the injury that was received. This Court has held that when similar injuries have occurred in the past, it is permissible "to interrogate further as to whether or not they had any connection with the claim then being presented." **Boyd v. Smith**, 390 So. 2d 994, 997 (Miss. 1980). Evidence showing that Hunter had suffered a previous head injury properly was allowed by the trial court. However, any evidence that tended to show that Jennifer was at fault, i.e., she was driving, or it was a one-vehicle accident, was not proper because it was not relevant to this medical malpractice suit.

> **B.** *Whether the trial court erred in limiting the evidence on the present net cash value of Hunter McIlwain's life.*

¶35. Jennifer argues that the trial erred in limiting the testimony of Dr. George Carter, her economic expert. In a bench conference prior to Dr. Carter's testimony, the trial court made the following ruling:

> The Court's ruling pursuant to the authority of the **Greyhound** case is that he will be allowed to testify as long as they're based on national averages, national averages that are set forth. That is the presumption that is set out by the law. As long as it's clear that that's the basis that he's going by, the national average.
>
> As far as the income, the Court will not allow any fringe benefits to be added because that's the law.

¶36. In **Rebelwood Apartments RP, LP v. English**, 48 So. 3d 483 (Miss. 2010), this Court held that "[f]ringe benefits must not be added unless they actually have been received." ***Id.*** at 496-97.

15

¶37.    In *Greyhound Lines, Inc. v. Sutton*, 765 So. 2d 1269 (Miss. 2000), a case which concerned the damages awarded to the estates of three children, this Court held:

> in cases brought for the wrongful death of a child where there is no past income upon which to base a calculation of projected future income, there is a rebuttable presumption that the deceased child's income would have been the equivalent of the national average as set forth by the United States Department of Labor. This presumption will give both parties in civil actions a reasonable benchmark to follow in assessing damages. Either party may rebut the presumption by presenting relevant credible evidence to the finder of fact. Such evidence might include, but is certainly not limited to, testimony regarding the child's age, life expectancy, precocity, mental and physical health, intellectual development, and relevant family circumstances. This evidence will allow the litigants to tailor their proof to the aptitudes and talents of the individual's life being measured.
>
> . . .
>
> [T]he consumption rate is another factor which may be argued by the parties to the finder of fact in support of increasing or decreasing the presumption that the deceased child's income would have been equivalent to the national average. The credibility and weight of such testimony as are to be determined solely by the finder of fact.

*Sutton*, 765 So. 2d at 1277, 1279.

¶38.    Based upon our caselaw and the record before us, we cannot say that the trial court erred in limiting the testimony of Dr. Carter.

## CONCLUSION

¶39.    Jennifer offered sufficient evidence of the requisite elements of a medical-negligence case against Dr. Wheelis; therefore, the trial court erred in granting Dr. Wheelis's motion for JNOV. However, Plaintiff's expert Dr. Miller failed to develop evidence that a violation of the standard of care in the setting in which she practiced was equivalent to that as applied to Dr. Russ, and we find the trial court did not err in granting Dr. Russ's motion for JNOV.

16

Furthermore, we find that, based on the record before us, the trial court properly limited testimony of Hunter's previous accident and properly limited the testimony of Dr. Carter. Therefore, the judgment of the trial court is affirmed in part and reversed in part, and this case is remanded to the Circuit Court of Adams County for a new trial consistent with this opinion.

¶40.    **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR**.