# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01139-COA

**DELLA SUMRALL AND ROY SUMRALL**          **APPELLANTS**

**v.**

**SINGING RIVER HEALTH SYSTEM**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/05/2014 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | ROBERT W. SMITH |
| ATTORNEYS FOR APPELLEE: | JOSHUA WESLEY DANOS |
| | ROY C. WILLIAMS |
| | BRETT K. WILLIAMS |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | JUDGMENT IN FAVOR OF APPELLEE |
| DISPOSITION: | REVERSED AND REMANDED-11/10/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1. Della and Roy Sumrall filed a medical-malpractice claim against Singing River Health System (Singing River). After a bench trial, the trial court entered a judgment in favor of Singing River. The Sumralls appeal the judgment and argue that: (1) Singing River's expert witness should not have been allowed to testify on the nursing standard of care; (2) the court erred in denying the Sumralls' motion for partial summary judgment on the standard of care; (3) the trial court applied the wrong burden of proof; (4) the judgment was against the overwhelming weight of the evidence; and (5) cumulative error necessitates reversal. We

find reversible error and remand this case to the Circuit Court of Jackson County for further proceedings.

FACTS AND PROCEDURAL HISTORY

¶2.     On February 23, 2012, Della was admitted to Ocean Springs Hospital[1] with a complicated case of acute cholecystitis, or inflamation of the gallbladder. Dr. Edward Dvorak, a general surgeon, recommended removal of Della's gallbladder and subsequently ordered a central line be placed in her external jugular vein. A "central line" refers to a central venous access device placed into a large vein in the patient. It is used to provide the patient with medicine, nutrients, fluids, or blood products. Della's treatment was completed without further complications.

¶3.     On February 29, 2012, Della was scheduled for discharge. Prior to her discharge, Chequita Steele, an OSH registered nurse, monitored Della. Nurse Steele testified that Della had previously complained of the inability to breathe when lying flat on her back and preferred to sit up. In addition to her problem with her gallbladder, Della had chronic pulmonary obstruction disease (COPD) and a partially collapsed lung, among other health problems.

¶4.     Nurse Steele testified that Della had been reclining in a chair in her hospital room at an angle of less than ninety degrees–specifically "somewhere in between 30 [degrees] and 45 [degrees]. Probably closer to 45 [degrees]." Nurse Steele talked with Della about the

---

[1] Singing River is the owner and operator of Ocean Springs Hospital (OSH). For purposes of this appeal, both will be referred to with the understanding that Singing River and OSH are the same legal entity.

need to remove the central line and the removal process. Thereafter, Nurse Steele removed the dressing that covered the insertion site and cut the sutures holding the line in place. Nurse Steele then instructed Della to perform the Valsalva maneuver while Steele applied pressure to the site with gauze and removed the central line. The Valsalva maneuver requires the patient to take a deep breath, hold it, and bear down.

¶5. Nurse Steele then testified that she held pressure on the exit site for approximately one minute. At that point, Della began gasping for breath, and she said, "I can't breathe." Della then became unresponsive.

¶6. Della was given emergency treatment in her room. Then, she was taken to the OSH intensive-care unit. Della suffered anoxic brain damage and permanent impairment. Della was discharged from OSH on March 29, 2012. The discharge instructions included information on treating a stroke.

¶7. On May 18, 2012, the Sumralls filed a medical-malpractice claim against Singing River and OSH. The complaint alleged that Nurse Steele improperly removed Della's central line, which caused an air embolus, cardiopulmonary arrest, and anoxic brain damage.

¶8. Because Singing River is a governmental entity, the Mississippi Tort Claims Act governs the Sumralls' claims. As required, the trial court held a bench trial from December 9 through December 11, 2013. On April 29, 2014, the trial court entered its findings of fact and conclusions of law. The trial court ruled in favor of Singing River and found that there was no nursing standard of care in the removal of a central line. Thus, the trial court concluded that Singing River did not violate any standard of care. On May 4, 2014, the trial

court entered a final judgment. It is from this judgment the Sumralls now appeal.

ANALYSIS

¶9. The Sumralls' appeal has raised five separate issues. Central to three of the issues is a challenge to the admission of the opinion evidence of Singing River's expert – Dr. James E. Corder. After considering the issues raised, we have combined these issues under the Sumralls' challenge that the trial court's findings were against the overwhelming weight of the evidence and find this issue dispositive.

¶10. The standard of review for a judgment rendered after a bench trial is well settled. "'A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,' and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Brister*, 838 So. 2d 274, 277-78 (¶13) (Miss. 2003) (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 908 (¶4) (Miss. 2000)). In addition, we must "recognize[] that the trial judge, sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses." *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (¶14) (Miss. 2003).

¶11. The trial court ruled in its findings of fact and conclusions of law:

> [Della] was set to be discharged from [OSH] on February 29, 2012[,] to a comprehensive rehabilitation center. Nurse Chequita Steele, an employee of [Singing River,] was in charge of preparing [Della] for discharge. At a couple of points in the nursing notes from Nurse Steele, she noted that [Della] was sitting in a bedside chair in a position less than 90 degrees. Nurse Steele testified that [Della] was in the same type position when she removed [Della's] central line. Nina Musgrove, [Della's] daughter, disagreed "with Nurse Steele's assessment of [Della's] positioning at the time of the central line removal."

4

Nurse Steele explained the central line removal procedure to [Della], [and] had her take a deep breath and then bear down (the [V]alsalva maneuver) as she removed the line. It appeared that [Della] understood and complied with the instructions she was given. Once the line was removed, Nurse Steele applied pressure to the wound site. Almost immediately after the central line removal, [Della] began experiencing distress, was gasping for air[,] and became unresponsive. Nurse Steele called for assistance, and the response team entered the room to administer care and take [Della] to [the] ICU. Based upon the testimony and medical records[,] it appears as though there is a disagreement as to the cause of the [Della's] distress. It was either an air embolism *or perhaps a cardiac event along with a stroke.*

The [Sumralls] presented two experts, Dr. Lidgia Vives and Nurse Crystal Keller, to offer evidence as to the nursing standard of care regarding patient positioning during central line removal. Both of [the Sumralls'] experts testified that the generally accepted standard of care for central line removal required the following: the nurse should educate the patient about the procedure; place the patient in the Trendelenb[u]rg position, which is described as having the patient in a supine position where the site of the central line insertion is below the heart; have the patient take a deep breath, hold and bear down (the [V]alsalva maneuver); then, at removal, place gauze with pressure at the removal site.

Both experts further agreed that if a patient were unable to tolerate the Trendelenb[u]rg position for whatever reason (breathing difficulty in that position or intracranial pressure), that a position other than and at less of an angle was acceptable to perform the central line removal. They did, however, testify[] that there was no indication that [Della] could not tolerate the Trendelenb[u]rg position at the time Nurse Steele removed her central line in preparation for her discharge to the rehabilitation facility[.]

[Singing River] offered the testimony of Dr. Jim Corder. *He opined that as to the applicable standard of nursing care for positioning a patient to remove a central line, there was none.* Based upon his knowledge and experience, the literature and the fact that hospital policies from across the country on this issue varied widely, no one position of a patient during central line removal was so overwhelmingly required, that there truly was no uniformity that would equate to a standard of care to be followed by nurses. Furthermore, it was noted in Nurse Steele's testimony that [Della] was unable to tolerate the Trendelenb[u]rg position due to some difficulty breathing while in that position. *Based upon the preponderance of the evidence presented for the Court's consideration, the Court finds as a matter of fact that there is no*

5

*recognized applicable standard of nursing care with regard to patient positioning during the removal of a central line.* The widely varying literature and policies clearly demonstrate that some recline during the removal process is preferred, but it also depends on the condition and tolerance of the individual patient.

(Emphasis added).

¶12. While there are additional findings and conclusions, we stop at this point in the trial court's findings to begin our consideration. The Sumralls challenge several findings by the trial court, but we find that there are two that are essential to our review. First, the Sumralls claim that Dr. Corder should not have been able to testify that there was no applicable standard of care. Second, the Sumralls contend that Dr. Corder should not have been allowed to testify that Della suffered a stroke.

¶13. Both in the pretrial expert witness disclosures and at trial, the Sumralls' expert witnesses testified that the applicable standard of care for a registered nurse removing a central line consisted of four key steps:

1. Educate the patient about the procedure;

2. Place the patient in the Trendelenburg position (lying on her back with her upper torso inclined downward so the central line insertion site is below the heart);

3. Perform the Valsalva maneuver (have the patient take a deep breath and bear down);

4. Upon removal, apply pressure and impermeable gauze at the site of removal.

¶14. Here, we are concerned with the second step, i.e., the proper positioning of the patient. We also note that there was testimony that the removal of a central line may be done by both

6

nurses and doctors. Thus, there was no testimony that the standard of care for the removal of a central line would be different depending on the type of medical professional. So we reject the allegation that Singing River failed to present evidence of a separate nursing standard of care. There was absolutely no evidence that a doctor or a nurse would remove a central line differently.

¶15. Dr. Vives and Nurse Keller explained that the proper positioning of the patient was medically necessary because ambient air pressure is greater than venous blood pressure above the heart, and an open hole can be a pathway for air to enter the venous system. They also testified that these standards of care were well known and supported by voluminous medical literature. For example, Johns Hopkins Hospital's policy and procedure states that use of the Trendelenburg position for removal of central lines is imperative.

¶16. The Sumralls also offered Della's medical records while at Singing River, which read:

> Nurse Note: 16:45, Katy Lorenzo: rapid response called on 2 East. Patient sitting up in chair unresponsive to verbal command.
>
> Dr. Rodberg (pulmonologist): Apparently while seated in the chair, the patient's central line was removed.
>
> Dr. McShurley (internal medicine): Shortly prior to discharge, the patient's central line was removed. Apparently was sitting in a chair and . . . became unresponsive.
>
> Dr. Rodberg (pulmonologist and employee of Singing River Health System): Impression: (1) probable air embolus from removal of central line[;] (2) near respiratory arrest[;] (3) shock secondary to air embolus.
>
> Dr. Karcher (neurologist): It is suspected that she may have had an air embolus due to removal of the central line. Assessment: possible anoxic brain injury status post near respiratory arrest yesterday with subsequent myoclonic jerks.

7

Dr. Taylor (pulmonologist and employee of Singing River Health System): probable air embolism with resultant cardiovascular collapse and possible anoxic brain injury.

Dr. Roth (internal medicine and employee of Singing River Health System): She had a little bit of air embolus associated with the venous process resulting in near cardiopulmonary arrest.

Dr. McShurley (internal medicine and employee of Singing River Health System): (3/4/12) shock probably due to air embolism resulting in cardio-vascular collapse secondary to removal of central line in the upright position.

Dr. Taylor (pulmonologist and employee of Singing River Health System): probable air embolism with resultant cardiovascular collapse.

(Quotations omitted).

¶17. The Sumralls also point to the testimony of OSH nurse Jenna Blaine. Nurse Blaine testified that she removed a second central line from Della on March 19, 2012, just twenty days after the February 29, 2012 incident, while accompanied by a Singing River "patient care representative" who was present precisely to assure the procedure was done correctly. Nurse Blaine explained that she placed Della in the Trendelenburg position, removed the central line, and applied pressure. The Sumralls contend that this was consistent with the exact steps that their experts and the applicable medical literature stated was the applicable nursing standard of care.

¶18. The Sumralls introduced the sworn deposition of Dr. John Weldon, a hospitalist and full-time employee of Singing River. Dr. Weldon was not on duty on February 29, 2012, but he rendered care to Della during her hospital stay. Dr. Weldon had made a one-line entry in Della's voluminous medical record. On March 5, 2012, several days after the central-line

8

incident, he wrote – "I think she had a stroke." Then, in his deposition, Dr. Weldon explained that he had no opinion on the etiology of Della's condition, that the root cause could well be air embolism, and that his later entry in the medical record referencing a stroke was simply meant to document that stroke was part of his differential diagnosis. Dr. Weldon confirmed there were no test results that confirmed a stroke, that he was not offering an opinion that Della had a stroke, and that he had no opinion as to whether stroke or air embolism was more probable. He was asked what he would do if he saw a Singing River nurse getting ready to pull a central line from a patient sitting up in a chair; Dr. Weldon testified, "I would stop her." When asked why, he stated, because "that's not the right way to do it."

¶19. To counter the Sumralls' expert opinions, Singing River called Dr. Corder. Dr. Corder is board certified in internal medicine and anesthesiology. His practice is as an intensivist, which he described as a subspecialist in critical-care medicine, basically directing intensive-care units, and caring for patients in them.

¶20. Over the Sumralls' objections, Dr. Corder was allowed to testify that Nurse Steele "did not breach the standard of care," and that "there is no national standard of care." He also was allowed to opine, over an objection, that "Dr. Weldon thought she had a stroke and I think she had a stroke." Dr. Corder admitted he had never read Dr. Weldon's deposition and did not know that Dr. Weldon stated under oath he had no opinion as to whether Della had a stroke. The Sumralls' objection was that Singing River's pretrial disclosures of Dr. Corder's opinions did not state that Dr. Corder would (a) identify the nursing standard of

9

care, (b) testify that Della had a stroke, or (c) testify that Della had a heart attack.

¶21. After the objection, the trial court took a recess to review Singing River's expert designation and disclosures. The trial court then sustained the objection to Dr. Corder testifying that Della had a heart attack, but allowed Dr. Corder to testify that he thought "she had a stroke" and that Nurse Steele did not breach the nursing standard of care. The Sumralls argue that this was further confused by Dr. Corder's testimony that there was "no national standard of care for positioning or for removal of a central line," and that the procedures used by Nurse Steele in removing the central line from Della were simply "techniques to optimize removal of a central line."

¶22. The Sumralls challenge the decision by the trial court to allow Dr. Corder's testimony that was not consistent with his pretrial disclosures. The standard of review for the admission or exclusion of evidence, such as expert testimony, is abuse of discretion. *Barrow v. May*, 107 So. 3d 1029, 1034 (¶10) (Miss. Ct. App. 2012). This Court will not overturn the trial court on an evidentiary issue unless the trial court abused its discretion or was clearly erroneous. *Worthy v. McNair*, 37 So. 3d 609, 614 (¶13) (Miss. 2010).

¶23. In *Canadian National/Illinois Central Railroad v. Hall*, 953 So. 2d 1084, 1097 (¶¶43-44) (Miss. 2007), the supreme court ruled:

> [O]ur rules of civil procedure require that a party must disclose the name of each expert expected to be called as a witness at trial, the subject matter on which each expert is expected to testify, *the substance of the facts and opinions to which the expert is expected to testify[,] and a summary of the grounds for each opinion*. M.R.C.P. 26(b)(4)(A)([i]). When a discovery violation occurs, one of the sanctions available under our rules of civil procedure is "an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing

10

designated matters in evidence." M.R.C.P. 37(b)(2)(B). This Court has stated that "[a]n expert should not be allowed to testify concerning a subject matter which is not included in the response to the interrogatory," and allowance of such would be reversible error. *Buskirk v. Elliott*, 856 So. 2d 255, 264 [(¶25)] (Miss. 2003).

Compliance with the rule involves a fact-intensive comparison between the subject matter contained in discovery responses and the subject matter of the testimony given by the expert at trial. *Id.* This Court has found discovery violations and subsequent exclusion of expert testimony to be proper when the experts testified as to a subject matter different from the subject matter contained in discovery responses. *See, e.g., Coltharp v. Carnesale*, 733 So. 2d 780, 786 [¶(27)] (Miss. 1999) (trial court committed reversible error by admitting expert testimony supporting additional theory of plaintiff's injury not revealed during discovery); *T.K. Stanley Inc. v. Cason*, 614 So. 2d 942, 950-51 (Miss. 1992) (trial court erred in admitting expert testimony regarding permanent disability, as it was a separate subject matter from causation). However, this Court has established that "where the stated subject matter in the response necessarily includes the subject matter testified to at trial, it is an abuse of discretion to exclude the expert's testimony." *Buskirk,* 856 So. 2d at 264 [(¶25)].

¶24. We have carefully examined Singing River's pretrial disclosures about Dr. Corder's testimony. According to the disclosure, Dr. Corder was to testify "that Nurse Steele's removal of [Della]'s central line was within the applicable nursing standard of care." It was also disclosed that he would testify "regarding the policies and procedures of Singing River Health Systems in the placement and withdraw of central lines."

¶25. The disclosure indicated that Dr. Corder would testify that the removal of the central line was "within the applicable nursing standard of care." This implies that there is an "applicable . . . standard of care." If Dr. Corder was to testify as to a standard of care that was different from the standard of care claimed by the Sumralls, Rule 26(b)(4)(A)(i) required that Singing River state the substance of the facts and opinions to which the expert was

11

expected to testify and a summary of the grounds for each opinion. Dr. Corder's disclosure certainly did not state, as he testified, that "there is no national standard of care." As such, we find Dr. Corder's testimony to be in conflict with the disclosures, and we conclude it was error to allow Dr. Corder to testify that "there is no national standard of care" for patient positioning for the removal of a central line.

¶26. Likewise, the disclosure also stated that Dr. Corder would testify "regarding the policies and procedures of Singing River Health Systems in the placement and withdraw[al] of central lines." Yet, in his testimony, Dr. Corder did not testify as to or offer any such policy or procedure for Singing River. Thus, we find his testimony was not consistent with the disclosures, and the disclosures did not state the substance of the facts and opinions to which the expert was expected to testify and a summary of the grounds for each opinion as required by Rule 26(b)(4)(A)(i). As such, we conclude it was error to allow Dr. Corder to testify that "there is no national standard of care" for patient positioning for the removal of a central line.

¶27. Also, the Sumralls challenge the admission of Dr. Corder's opinion that "Dr. Weldon thought she had a stroke and I think she had a stroke." Dr. Weldon did not testify that Della had a stroke. Thus, there was no factual basis to support Dr. Corder's statement on Dr. Weldon's opinion. Also, Dr. Corder's disclosures stated that he would testify "that it is highly improbable [Della] suffered from an air embolus. Furthermore, Dr. Corder will opine that, even assuming an air embolus occurred, it is a known complication of central line

12

removal."[2]

¶28. Dr. Corder's designation does not mention that he would opine that Della had a "stroke." It does indeed state "that it is highly improbable [she] suffered from an air embolus," but it does not disclose he would testify she suffered a stroke. Without mention of the stroke, we must also determine that – as to the opinion that Della suffered a "stroke" – the disclosures did not state the substance of the facts and opinions to which the expert was expected to testify and a summary of the grounds for each opinion as required by Rule 26(b)(4)(A)(i). As such, we find Dr. Corder's testimony to be in conflict with the disclosures, and we conclude it was error to allow Dr. Corder to testify, "Dr. Weldon thought she had a stroke and I think she had a stroke."

¶29. Therefore, we find that the trial court abused its discretion in allowing Dr. Corder to testify inconsistent with, outside of, and beyond his designation. First, we find that the trial court's finding that "as a matter of fact . . . there is no recognized applicable standard of nursing care with regard to patient positioning during the removal of a central line" and "without an applicable standard of care, there can be no breach of such," was not supported by substantial, credible, and reasonable evidence. Second, we find that the trial court's finding that "[i]t was either an air embolism or perhaps a cardiac event along with a stroke" was not supported by substantial, credible, and reasonable evidence.

---

[2] In the second amended designation of expert witnesses, Singing River added that "Dr. Corder will be offered to contradict any opinions on standard of care and/or causation as stated in the depositions of Plaintiffs' experts, Dr. Ladgia Vives and Crystal Keller, R.N." However, Singing River did not offer any further explanation on the contradictions that were intended to be part of Dr. Corder's testimony.

13

¶30. Further, we find that the Sumralls offered expert testimony, supported by extensive medical literature, to indicate that there was a standard of care for a nurse to remove a central line. We recognize that the standard of care may include some variation in the proper positioning of the patient depending upon her condition. However, the trial court's finding that there is no standard of care is against the overwhelming weight of the evidence and must be reversed. Hence, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

¶31. In addition, we recognize that the Sumralls have also challenged a number of the trial court's discovery and pretrial rulings under the issue they refer to as "cumulative error." Because we have decided to reverse and remand this case for further proceedings, we find the issues raised in the cumulative-error section are now moot. Furthermore, we are of the opinion that the Sumralls have raised these issues only as to the finding of cumulative error and do not ask this Court to reverse the trial court's ruling on each of the individual issues. Had the Sumralls so intended, they would have provided citations to legal authority and included these as separate issues. As a result, we make no ruling as to these separate issues.

¶32. **THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., IRVING, P.J., BARNES, MAXWELL, FAIR AND JAMES, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. WILSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY ISHEE, J.**

**CARLTON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶33.    I respectfully concur in part and dissent in part. I agree with the majority's decision reversing the judgment of the trial court. However, I would render a judgment in favor of the Sumralls as to the issue of liability and remand to the trial court to determine damages. I submit that the findings and judgment of the trial judge in this bench trial were not supported by credible or substantial evidence in the record. I also submit that the trial court's findings were contrary to established Mississippi law. As a result, the judgment is against the overwhelming weight of the evidence and contrary to the law.

¶34.    In this case, the record reflects that the Sumralls met their burden of presenting a prima facie case of medical negligence against Singing River Hospital and its nursing staff.[3]

_____

[3] *See McIlwain v. Natchez Cmty. Hosp. Inc.*, 2013-CA-00572-SCT, 2015 WL 5157499, at *3 (¶15) (Miss. Sept. 3, 2015) (setting forth elements to show medical negligence of hospital and of its staff). The record reflects that the Sumralls' expert Dr. Lidgia Vives, a vascular neurologist, testified that Nurse Steele breached the applicable standard of care by negligently removing Della's central line jugular catheter and thereby caused the devastating and permanent damage alleged in this case. Dr. Vives testified that Nurse Steele violated the applicable standard of care as follows: by negligently removing the central line catheter from Della while she sat up in a chair, instead of removing it in the recommended Trendelenburg position, a supine position that places the catheter site below the heart to prevent an air embolism; Nurse Steele failed to document the use of the Valsalva maneuver in the patient chart and that the Valsalva maneuver is required to prevent air embolisms; Nurse Steele's deposition testimony reflects that Nurse Steele left the site uncovered; and Nurse Steele removed the central line without a doctor's order to do so. The record also reflects expert testimony that Nurse Steele removed the central vein without supportive or intervention care such as a heart monitor, available 100% oxygen for suspected air embolism, and without monitoring Della's respirations or EKG. The Sumralls' medical experts included Dr. Vives, Dr. James Martin, and Crystal Keller, R.N. Dr. Martin was the medical director of the nursing facility to which Della was admitted for care after her discharge from Singing River Hospital. Dr. Vivies and Nurse Keller both testified as to the applicable standard of care, and their testimony was supported by medical literature. The expert testimony established that the standard of nursing care for removing a central line requires that a patient be placed in the Trendelenburg position, or a supine position, so that the central line insertion site in the jugular is at or below her heart to reduce the risk of air embolus. The standard also requires educating the patient about the procedure and getting

15

The Sumralls met this burden specifically through the testimony of two medical experts establishing the following evidence of the required elements: (1) the standard of nursing care applicable in this case; (2) the duty owed to Della in this case to conform to that required medical standard; (3) the breach of that duty by Singing River as the proximate cause of Della's injuries and damages.[4] "Recovery in a negligence action requires proof by a preponderance of the evidence of the conventional tort elements: duty, breach of duty, proximate causation, and injury (i.e., damages)." *Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So. 2d 1346, 1354 (Miss. 1990). Singing River, however, failed to present competent conflicting evidence and therefore failed to rebut the Sumralls' prima facie case.

¶35. The laws of the state of Mississippi have long recognized that "[a] hospital may be subject to liability for its own acts of negligence toward patients and others, but also, it may be liable where the negligence of its health care personnel is imputed to the hospital under an agency theory." *Boyd v. Lynch*, 493 So. 2d 1315, 1319 (Miss. 1986).[5] The determination of whether a duty is owed constitutes a question of law, and is reviewed de novo on appeal.

---

the patient to perform the Valsalva maneuver, hold pressure, and apply occlusive gauze. Expert testimony reflects that central venous catheters may be inserted at locations other than the jugular, like the chest or groin, which may not required not require a supine position to place the insertion site at or below the heart.

[4] *See McIlwain*, 2013-CA-00572-SCT, 2015 WL 5157499, at *3 (¶15).

[5] *See Delta Reg'l Med. Ctr. v. Venton*, 964 So. 2d 500, 506 (¶¶16-20) (Miss. 2007) (finding that negligent acts of nursing staff and other employees constituted the proximate contributing cause of the patient's injuries and death); *DeLaughter v. Lawrence Cnty. Hosp.*, 601 So. 2d 818, 824-25 (Miss. 1992); *Miss. Baptist Health Sys. Inc. v. Kelly*, 88 So. 3d 769, 776-77 (¶¶22, 26) (Miss. Ct. App. 2011).

*See Scafide v. Bazzone*, 962 So. 2d 585, 592-93 (¶¶20-21) (Miss. Ct. App. 2006).[6]

¶36.    In applying a de novo standard of review to the findings and judgment of the trial court, I submit that the trial court erroneously found that no duty was owed by Nurse Steele, and hence by Singing River, to Della.  Mississippi law has long recognized that nursing personnel of a hospital owe at the very least a duty to exercise due care to the patients.[3]  *See Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 148 (¶29) (Miss. 2007).  Thus, Singing River failed to present competent medical expert testimony to rebut the Sumralls' prima facie case.[4]  The trial court therefore erred as a matter of law in its findings, and its resulting verdict is contrary to the evidence and law.  "If a [hospital] chooses to allow a nurse to perform a non-delegable duty" of a physician to assure that medical treatment is properly ordered and administered, then "the [hospital] must accept responsibility if that duty is breached" by a nurse.[5]  *See and compare Sacks v. Necaise*, 991 So. 2d 615, 619 (¶9) (Miss. Ct. App. 2007).  The expert testimony presented by the hospital's expert, Dr. Corder, and the

---

[6] *See also Belmont Homes Inc. v. Stewart*, 792 So. 2d 229, 232 (¶11) (Miss. 2001) (whether a duty is owed is a question of law that is reviewed de novo).

[3] Dr. Corder's testimony conflicts with established law that reflects that at the very least, the hospital owes its patients a duty to exercise reasonable care.  *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 148 (¶29) (Miss. 2007).  "When a doctor notifies a hospital that a patient is at high risk for a particular type of complication, the hospital must take reasonable precautions to reduce or eliminate the risk, if possible."  *Id*. (citing *Clark v. St. Dominic-Jackson Memorial Hosp*., 660 So. 2d 970, 972-73 (Miss. 1995)).

[4] *See also* M.R.E. 702 (evidentiary criteria for medical experts).

[5] *See* Code Miss. R. 15-16-1:41.30 (hospital policies must comply with professionally recognized nursing standards and delineate the functions for which the nursing service is responsible; policies must address orders).

17

trial judge's related finding that the hospital owed no duty to Della caused "error within the trial mechanism itself [causing] a legally incorrect or unjust verdict to be rendered." *Compare Loyacono v. Travelers Ins. Co.*, 168 So. 3d 981, 983 (¶8) (Miss. Ct. App. 2013), *and Bell v. City of Bay St. Louis*, 467 So. 2d 657, 659 (Miss. 1985) (verdict reversed and rendered where jury was instructed contrary to Mississippi law).

¶37. The trial court also erred in its findings and verdict in relying on the medical opinion testimony of Nurse Steele for opinions falling outside of the scope of her nursing expertise. The record reflects no physician's order authorizing nurses, or Nurse Steele, to remove central venous catheters, or to remove Della's central catheter. The record does reflect, however, that upon embarking on Della's gallbladder surgery, her treating physician issued an order for a physician to insert the right internal jugular central venous line in Della, and anesthesiologist Dr. Paul Harris inserted her central venous catheter. The record further reflects that Nurse Steele decided on her own to remove Della's central venous catheter without a doctor's order and without even consulting a doctor, and she was allowed to render medical expert opinion testimony outside of her nursing expertise and competence.

¶38. Singing River argued at trial, and on appeal, that evidence showed that Nurse Steele assessed on her own that Della's central venous jugular catheter should be removed while Della sat upright, since Nurse Steele decided that Della could not tolerate a Trendelenburg position (where a patient with a jugular central line lies on her back with her upper torso inclined downward, so the central line insertion site is at or below the heart). The testimony of the Sumralls' medical expert, Dr. Vives, established that placing the central jugular

18

catheter site at or below the heart increased venous pressure on the jugular vein to assist in preventing an air embolus. The Sumralls' medical expert testimony also reflects that Della could have tolerated this positioning, and thus the trial court erred in relying on Nurse Steele's testimony asserting that Della could not.[6] Nurse Steele lacked the medical qualifications to engage in removing a central venous jugular catheter without a doctor's order, and she also lacked competency to render medical expert testimony and a medical opinion as to causes of illnesses or how Della would or would not respond to the Trendelenburg position. Under Mississippi law, nurses are not qualified to medically diagnose or competent to render an opinion as to medical causation. *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 652 (¶¶20-21) (Miss. 2009) (nurses are not competent to testify on issues or causation or attest to causes of illnesses), *see also Richardson v. Methodist Hosp. of Hattiesburg Inc.*, 807 So. 2d 1244, 1247-48 (¶¶14, 19) (Miss. 2002) (finding medical diagnosis is outside a nurse's scope of practice).[7] Since Nurse Steele was not medically qualified or competent to render expert medical opinion testimony as to whether Della could or could not medically tolerate the Trendelenburg position, her opinion testimony as to this

---

[6] As noted by the majority, Nurse Steele testified that Della had been reclining in a chair in her hospital room at an angle of less than ninety degrees, describing the position as "somewhere in between 30 [degrees] and 45 [degrees]. Probably closer to 45 [degrees]." The trial judge's finding and judgment relied upon Nurse Steele's testimony on that issue, in finding that Nurse Steele determined Della's need to sit "in a bedside chair in a position less than ninety degrees . . . when she removed [Della's] central line."

[7] *See* M.R.E. 702 (expert testimony); *Mid-S. Retina LLC v. Conner*, 72 So. 3d 1048, 1051 (¶10) (Miss. 2011).

issue is insufficient to support the verdict and judgment in this case.[8]  Contrary to Nurse Steele's unqualified assertions, the record reflects that the Sumralls' medical expert, Dr. Vives, testified that Della could have tolerated the Trendelenburg position in her condition, and that such positioning would have helped Della's breathing, and not hindered it.  The Sumralls also presented evidence that after being discharged from Singing River to an assisted nursing center, Della tolerated the Trendelenburg position for a central line removal without incident.  The trial court's findings and judgment were based upon incompetent evidence, and were contrary to Mississippi law.  Furthermore, the record reflects that Singing River failed to rebut the Sumralls' prima facie case of medical negligence with competent evidence.

¶39.    Accordingly, I concur with the majority's decision to reverse the trial court's judgment.  I would, however, render a judgment on the issue of liability in favor of the Sumralls, and remand the case back to the trial court to determine damages.

**WILSON, J., DISSENTING:**

¶40.    I agree with most of the majority opinion.  I agree that the Dr. Corder should not have been allowed to testify that there is no recognized standard of care regarding patient positioning during the removal of the central line.  I also agree that Dr. Corder should not have been allowed to testify that Della had a stroke.  Therefore, I also agree with the majority that the circuit court's findings based on this testimony are not supported by substantial evidence.

---

[8] *Vaughn*, 20 So. 3d at 651-52 (¶¶20-21) (finding nurses are not competent to testify on causes of illnesses).

¶41. Despite my agreement with the majority on these points, I believe that we are compelled to affirm because the circuit court's decision was based on additional, independent, and sufficient findings of fact that do not rely on any testimony from Dr. Corder that was beyond the scope of Singing River's expert disclosures. The majority quotes extensively from the trial court's findings of fact but admittedly "stop[s]" in the middle of those findings. *Ante* at (¶¶11-12). The next paragraph of the trial court's opinion, which the majority does not quote, is critical:

> Even if plaintiff had been able to definitively establish the Trendelenberg [sic] position as the applicable standard of nursing care for [positioning the patient during] central line removal, the facts also establish that such a standard would not be absolute, and under the right circumstances, a position other than Trendelenberg [sic] is acceptable. Here, the defendant presented evidence as to the plaintiff's ability to tolerate the Trendelenberg [sic] position. Therefore, even if that were the standard, the intolerance of the plaintiff to that position would allow for deviation from the standard without violation of the standard.

The trial court's finding that "under the right circumstances, a position other than Trendelenberg [sic] is acceptable" was based not only on Dr. Corder's testimony but also on the testimony of Della's own experts.

¶42. When, as in a case brought under the Tort Claims Act, the circuit judge sits as the finder of fact, we "are bound by the [circuit] court's judgment if its judgment was supported by substantial evidence and was not manifestly wrong." *Amos ex rel. Amos v. Jackson Pub. Sch. Dist.*, 139 So. 3d 120, 124 (¶10) (Miss. Ct. App. 2014). "As to the findings of fact and conclusions of law, the judgment of a circuit . . . court in a non-jury trial is entitled to the same deference on appeal as a chancery court decree." *Id.* (quotation marks omitted). "Furthermore, if the [circuit] court's judgment can be sustained for any reason, it must be

21

affirmed, *even if the trial judge based it upon the wrong legal reason*." *Id.* (emphasis added; quotation marks, ellipsis, and brackets omitted). "The trial judge's conclusions will not be disturbed on appeal where there is substantial supporting evidence in the record, *even if this Court might have found otherwise as an original matter*." *Scott Addison Constr. Inc. v. Lauderdale Cnty. Sch. Sys.*, 789 So. 2d 771, 773 (¶8) (Miss. 2001) (emphasis added) (citing *Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss. 1994)).

¶43. The factual question whether Della was able "to tolerate the Trendelenberg [sic] position" was the subject of conflicting evidence at trial. But there is evidence to support the circuit court's finding that she could not tolerate it, including Nurse Steele's testimony and Dr. Corder's testimony. In addition, Della's experts acknowledged that certain of her conditions—chronic obstructive pulmonary disease (COPD) and a partially collapsed lung, which required her to use an oxygen tank—could make it difficult for a patient to breathe in the Trendelenburg position. I might or might not have reached the same conclusion as the trial judge, but that is not our standard of review. The question is simply whether there was substantial supporting evidence in the record to support the above-quoted factual findings. There was, and those factual findings are sufficient to sustain the judgment independent of and despite any error committed by the trial judge in overruling Della's objections to parts of Dr. Corder's testimony. *See, e.g.*, *Palmer v. Biloxi Regional Med. Ctr. Inc.*, 564 So. 2d 1346, 1354-55 (Miss. 1990) (holding that there can be no liability in a medical malpractice case absent a breach of the standard of care). Therefore, I respectfully dissent.

**ISHEE, J., JOINS THIS OPINION.**

22